**CITY OF JEFFERSONVILLE, Indiana and City of Jeffersonville Sanitary Sewer Board, Appellant–Defendant,**

v.

**ENVIRONMENTAL MANAGEMENT CORPORATION, Appellee–Plaintiff.**

No. 10A01–1005–PL–217.

Court of Appeals of Indiana.

Sept. 15, 2011.

R. Scott Lewis, David A. Lewis, Smith Carpenter Thompson Fondrisi Cummins & Lewis, Jeffersonville, IN, Attorneys for Appellants.

David E. Gray, Mark E. Miller, Bowers Harrison, LLP, Evansville, IN, C. Gregory Fifer, Applegate & Fifer, Jeffersonville, IN, Attorneys for Appellee.

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants–Defendants, the City of Jeffersonville (Jeffersonville), and the City of Jeffersonville Sanitary Sewer Board (Sewer Board) (collectively, the City), appeal the trial court's judgment in favor of Appellee–Plaintiff, Environmental Management Corporation (EMC), with respect to EMC's claims that (1) the City breached its contract with EMC, (2) violated Indiana's Open Door Law, and (3) acted in contempt of an agreed entry and order.

We affirm in part, reverse in part, and remand.

### ISSUES

The City raises six issues on appeal, which we restate as follows:

(1) Whether the trial court erred in finding that the City breached its contract with EMC;

(2) Whether the trial court abused its discretion in excluding documentary evidence;

(3) Whether the trial court erred in finding that the City violated Indiana's Open Door Law;

(4) Whether the trial court abused its discretion in finding Jeffersonville in contempt of an agreed entry and order;

(5) Whether the trial court abused its discretion in awarding attorney's fees to EMC for services that were unrelated to the City's Open Door violations or contempt of court proceedings; and

(6) Whether the trial court erred in ordering the City to reimburse EMC for its costs, including litigation expenses.

On cross-appeal, EMC raises one issue, which we restate as follows: Whether the trial court erred in deducting certain expenses from EMC's lost profits damage claim.

### FACTS AND PROCEDURAL HISTORY

Jeffersonville owns a sanitary sewer collection and treatment system that is operated under the control of the Sewer Board. On May 1, 2004, Jeffersonville entered into a contract with EMC (the Contract) through the Sewer Board concerning Jeffersonville's sewer system. Among other provisions, EMC agreed to "operate and maintain the [wastewater treatment plant (Plant)] so that the effluent discharge [would] meet[] or exceed[] the effluent requirements established by the U.S. Environmental Protection Agency [(EPA)] and [the Indiana Department of Environmental Management (IDEM)]," to "operate and maintain the [c]ollection [s]ystem in such a manner as to extend its useful life, to provide maximum capacities … and to prevent public health hazards."

(Appellant's Amended App. vol. 1, pp. 33–4). The Contract also required EMC to:

i) [i]dentify sources of problems within the sewer system through inspection, monitoring and investigation, assisting the City's Engineer and staff with inspection of all new sewer taps and assisting builders in locating existing sewer mains and taps;

ii) [c]lean and maintain sanitary sewers, combined sewers, and [Combined Sewer Overflows (CSOs)] on a regularly scheduled preventative maintenance basis to ensure that wastewaters are transported to the wastewater treatment facilities in compliance with the [National Pollution Discharge Elimination System (NPDES)] permit.

iii) [i]nspect, clean, maintain and repair lift stations on a regularly scheduled preventative maintenance basis as set forth in Appendix F to ensure waste waters are transported to the wastewater treatment facilities in compliance with the NPDES permit.

iv) [p]revent sewage from bypassing to waters of the State and protect the [c]ollection [s]ystem from flooding due to high water, in accordance with the Water Pollution Control Acts Amendments, Public Law 92–500, and the Clean Water Acts Amendment.

v) [e]liminate odors and potential sources of odors to the extent possible and practical based on the generally accepted standards of good practice in municipal wastewater management and operations.

vi) [i]mplement a preventative maintenance program to reduce nuisance stoppages, employing effective electronic information system hardware and software.

(Appellant's Amended App. vol. 1, pp. 35–6).

Paragraph 5(b) of the Contract gave both parties the right to terminate the Contract prematurely in the event of a material breach or unsatisfactory performance of a material obligation. However, Paragraph 5(b) required the terminating party to first provide written notice of the material breach or unsatisfactory performance to the breaching party, upon which time that party had 90 days to cure its performance. If the breaching party did not cure within 90 days, the terminating party could then terminate the Contract.

Effective December 1, 2006, IDEM issued a NPDES permit to Jeffersonville and EMC, authorizing the Plant to discharge effluent into the Ohio River, Cane Run, and an unnamed drainage ditch in accordance with certain effluent limitations, monitoring requirements, and conditions. The permit was effective until November 30, 2011 and required EMC to submit monthly reports to IDEM.

Also in 2006, the United States Department of Justice (DOJ), the EPA, and IDEM commenced a legal enforcement action against Jeffersonville and EMC, alleging that they had violated the terms of their NPDES permit and the Clean Water Act. The parties began negotiations for a consent decree based on the violations, but did not immediately resolve the issue. In the meantime, Thomas Galligan (Mayor Galligan) was elected Mayor of Jeffersonville in November of 2008. After his election, but prior to commencement of his term on January 1, 2008, Mayor Galligan held two meetings with representatives of EMC concerning the manner in which EMC was operating and maintaining Jeffersonville's sewer system. In these meetings, he expressed concern that some of the sewer system pumps did not work, that sanitary sewer overflow was spilling into people's yards every time it rained, that EMC did not have an adequate staff,

and that the plant was discharging effluent into the waters of the United States, contrary to EMC's pending consent decree.

On April 15, 2008, the Sewer Board held a regular meeting that was open to the public. The Sewer Board consisted of three members—Mayor Galligan, Jeffrey Caldwell, and William Saegesser (Saegesser). EMC representatives and EMC's legal counsel also attended the meeting, and at the meeting Mayor Galligan discussed his concerns regarding EMC's operation of the Plant. He told EMC that he had encountered exposed electrical wires coming out of an electrical unit at the sewer system's Old Stoner Station, that maintenance levels needed to be improved, that sump pumps needed to be improved, and that manpower was an issue. According to both Mayor Galligan and Saegesser, the Sewer Board instructed its attorney, R. Scott Lewis (Attorney Lewis), to send a written notice letter to EMC informing EMC of its deficient operation and maintenance of the sewer treatment system. Attorney Lewis was also instructed to send a second letter to EMC terminating the Contract if EMC had not corrected the issues within 90 days. This exchange, however, was not recorded in the meeting's minutes.

Following that meeting of April 15, 2008, Attorney Lewis sent EMC a letter on April 18, 2008, requesting that EMC provide (1) detailed documentation of all regularly scheduled sewer cleaning activities in the Jeffersonville sewer system, including all maintenance activities for the lift stations; (2) any inspection, monitoring results, or investigations identifying any potential sources of problems that resulted in customer complaints or sanitary sewer overflows;[1] and (3) records for January 2005 to March 31, 2008 pertaining to the Plant—including lists of equipment and

equipment maintenance, a history of work performed, and customer complaints. EMC received Attorney Lewis' letter on or about May 5, 2008. The letter did not indicate that the City intended to terminate the Contract if the performance issues were not corrected within 90 days.

Meanwhile, EMC prepared and submitted a report to the Sewer Board dated April 25, 2008 that addressed the concerns Mayor Galligan had raised during the Sewer Board's April 15 meeting. In the report, EMC provided data on combined sewer maintenance, I/I inspections and notifications, and the schedule for lift station inspections. EMC clarified that the reason EMC had not detected a problem with a broken lateral line that led to infiltration at the Riverport Lift Station was that the lateral line was private property and only active when the creek was at flood stage. EMC also noted that conducting a sanitary sewer evaluation study as requested by Jeffersonville would be a "significant increase" in the scope of the Contract and that EMC's staff was already at full capacity, contrary to the City's allegations. (Appellant's App. vol. 2, p. 276).

Next, in a letter dated May 23, 2008, EMC informed Jeffersonville that the Sewer Board's April 18 letter requested documentation that exceeded EMC's production obligations under the Contract. EMC pointed to Paragraph 5(g) of the Contract, which required EMC to provide "all records reasonably requested to enable [Jeffersonville] to conduct a *quarterly* performance audit of EMC's compliance with the terms and conditions of [the Contract]." (Appellee's Amended App. vol. 1, p. 92) (emphasis added). According to EMC, the records requested went beyond the scope of that provision both in time and detail, as EMC had already complied

1. Specifically, the City requested information on customer complaints or sanitary sewer overflows reported from January 2005–March 31, 2008 pertaining to inflow and infiltration.

with requests for records in the most recent quarter. In addition, EMC denied ever receiving a written notice from Jeffersonville that EMC had breached the terms of the Contract and claimed that Mayor Galligan's oral statements at the April 15 Sewer Board meeting did not constitute written notice as required by Paragraph 5(b) of the Contract. Jeffersonville did not submit a written response to EMC's letter.

Instead, in a letter dated August 7, 2008, the City notified EMC that they were terminating the Contract pursuant to Paragraph 5(b) because EMC had failed to provide the records requested in the City's April 18 letter and had failed to correct the operational deficiencies previously identified at the April 15 meeting. EMC responded to Jeffersonville in a letter dated August 13, 2008, in which it advised Jeffersonville that the City still had not provided EMC with written notice of a specific material breach or unsatisfactory performance as contractually required prior to termination.

On August 18, 2008, EMC filed a Complaint for declaratory judgment, breach of contract, and specific performance, as well as a motion for preliminary injunction and expedited hearing with the trial court. The trial court scheduled an expedited hearing on the motion for preliminary injunction for August 25, 2008. On August 22, 2008, though, the trial court approved an agreed entry and order (Agreed Entry) vacating and resetting the preliminary injunction hearing that the parties had submitted. In the Agreed Entry, the parties agreed: (1) to maintain the status quo with respect to their rights and obligations under the Contract pending the trial court's ruling on the motion for the preliminary injunction; (2) not to interfere with EMC's access to the sewer treatment and collection system facilities in Jeffersonville; and (3) that Jeffersonville would not make any attempts to hire EMC employees to work for Jeffersonville in any capacity pending the ruling on the preliminary injunction.

On September 19, 2008, following the Agreed Entry, EMC conducted a deposition of a former Jeffersonville consultant, Leonard Ashack (Ashack), and discovered that the Sewer Board had authorized Attorney Lewis to send the City's April 18, 2008 letter during an executive session of the Sewer Board that had been held prior to the regular Board meeting on April 15, 2008. Ashack also testified that Jeffersonville's August 7, 2008 termination letter was authorized during an executive session of the Sewer Board.

Consequently, on October 9, 2008, EMC filed an Open Door Law complaint with Indiana's Public Access Counselor, alleging that the City had violated Indiana's Open Door Law by failing to hold a vote at a regular, public meeting before authorizing its April 18 and August 7, 2008 letters. On October 16, 2008, the Public Access Counselor Heather Willis Neal (Counselor Neal) determined that she could not issue an advisory opinion regarding the complaint because it concerned a specific matter with respect to which a lawsuit had been filed. Counselor Neal noted, however, that the Indiana Court of Appeals had previously ruled that a governing body could take official action—such as making a decision—during an executive session.[2]

Subsequently, on October 17, 2008, EMC filed a Complaint against the City regarding the City's alleged violation of Indiana's Open Door Law under Cause Number 10D01–0810–PL–984 (Cause 984). The parties engaged in mediation, but on

---

**2.** In support of that proposition, the Public Access Counselor cited *Baker v. Town of Middlebury*, 753 N.E.2d 67 (Ind.Ct.App.2001).

November 21, 2008, EMC filed a motion for summary judgment.

On December 1, 2008, Mayor Galligan appeared at the Plant with two Jeffersonville police officers and took over its operations, declaring that EMC could no longer have access to the Plant or the treatment system, even though the Sewer Board had not held a vote at a public meeting concerning EMC's removal. As a result, on December 9, 2008, EMC filed a second formal Complaint with the Indiana Public Access Counselor's office, and on December 30, 2008, EMC filed a second Open Door Complaint against Jeffersonville under Cause Number 10D01–0812–PL–1233, alleging that Jeffersonville's takeover of the Plant was an official action that had not been authorized at a public meeting. On December 1, 2008, the same day as the Mayor's takeover, EMC also filed a verified information for contempt, a motion to enjoin further violation of the Agreed Entry, and a motion for an emergency hearing thereon against the City, asking the trial court to find that the City was in contempt of the Agreed Entry.

On December 16, 2008, Counselor Neal responded to EMC's second formal complaint with the Indiana Public Access Counselor, once again determining that she was precluded from issuing an advisory opinion as a result of EMC's pending litigation against the City. On February 13, 2009, the trial court held a summary judgment hearing on EMC's Open Door Complaints, and on February 24, 2009, the trial court denied summary judgment for both parties. The trial court also consolidated the two Open Door Complaints, EMC's contempt claim, and EMC's breach of contract claim for trial.

A bench trial was conducted on all four matters on June 23–25, 2009; July 21–23, 2009; and December 2–4, 7–10, 14 and 15, 2009. On April 12, 2010, the trial court entered findings of fact, conclusions thereon, and a judgment, finding in favor of EMC on all four matters. The trial court awarded damages to EMC and ordered the City to pay EMC's attorney's fees and costs.

The City now appeals. Additional facts will be provided as necessary.

### DISCUSSION AND DECISION

### APPEAL

#### *Standard of Review*

Because the trial court entered special findings of fact and law, we apply a two-tiered standard of review on appeal. *Meridian Title Corp. v. Pilgrim Financing, LLC*, 947 N.E.2d 987, 990 (Ind.Ct.App. 2011). First, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Id.* We will set aside the trial court's findings and conclusions only if they are clearly erroneous and a review of the record leaves us firmly convinced that a mistake has been made. *Id.* Moreover, in reviewing a trial court's findings, we neither reweigh the evidence nor reassess the credibility of the witnesses. *Id.* We must accept the ultimate facts as stated by the trial court if there is evidence to sustain them. *Id.*

#### I. *Termination of the Contract*

With respect to EMC's breach of contract claim, the trial court determined that the City did not adequately provide EMC with written notice of its unsatisfactory performance at least 90 days prior to the City's termination of the Contract, which was a breach of Paragraph 5(b) of the Contract. Now, the City argues that it provided sufficient notice in its April 18, 2008 letter when its letter is interpreted in combination with the April 15, 2008 regular Sewer Board meeting. Specifically, the City points to the fact that it orally "gave notice" to EMC at the April 15 regular

meeting, as well as the fact that EMC's internal documents indicated it knew that the City had given notice.

In Indiana, the interpretation of a contract is controlled by the intent of the parties as expressed by the clear language of the contract. *Delgado v. Boyles,* 922 N.E.2d 1267, 1270 (Ind.Ct.App.2010), *trans. denied.* Clear, plain, and unambiguous contract terms are conclusive of the parties' intent, and a court will not construe the contract or consider extrinsic evidence, but will merely apply the contractual provisions as they are written. *Fidelity Nat. Title Ins. Co. v. Mussman,* 930 N.E.2d 1160, 1165 (Ind.Ct.App.2010), *trans. denied; In re South Haven Sewer Works, Inc.,* 880 N.E.2d 706, 710 (Ind.Ct. App.2008). Moreover, a document is not ambiguous simply because the parties disagree concerning the proper interpretation of the terms. *In re South Haven Sewer Works, Inc.,* 880 N.E.2d at 710. A contract is ambiguous only if a reasonable person could find its terms susceptible to more than one interpretation. *Delgado,* 922 N.E.2d at 1270.

Based on this standard, we cannot agree with the City that it provided sufficient notice to EMC 90 days before terminating the Contract. The Contract term "written notice" is clear and unambiguous on its face, even though it is not defined in the Contract. "Written" is the past participle of "write," which is defined by the Webster's dictionary as "to draw up or draft, as a will." Webster's II New College Dictionary 1274 (2001). The City's verbal comments at the April 15, 2008 regular Sewer Board meeting were not "written" since they were oral and were not even recorded in the Sewer Board's minutes. Saegesser testified at trial that the notice was not included in the minutes because the minutes were transcribed from an audio recording of the meeting that cut off before the meeting ended.

However, the City does not dispute that the Sewer Board had the opportunity to correct the minutes before approving them at the next Sewer Board meeting and failed to do so.

In addition, the Sewer Board's April 18 letter did not provide EMC with written notice that the City intended to terminate the Contract. In the letter, the City stated:

> At the Sanitary Sewer Board's regular business meeting on April 15, 2008, and during prior meetings between Mayor Galligan, the Sanitary Sewer Board, and representatives of EMC, the City has advised EMC of several deficiencies in EMC's operation and maintenance of Jeffersonville's sewer treatment and collection system. At the April 15, 2008 meeting, EMC's representatives denied any deficiencies in its operation and maintenance of the City's sewer system. To properly ascertain EMC's compliance with its contractual duties pursuant to [s]ection 5(g) of said Agreement, please comply with the following requests....

(Appellant's Amended App. vol. 1, p. 234). In the remaining paragraphs, the City requested documentation of various records, including inspection and monitoring results. As EMC argues, and we agree, there is no language in the letter indicating that the City intended to give EMC notice that it would terminate the Contract in 90 days absent a cure of EMC's deficient performance. The City referred to its allegations at the April 15 regular meeting, but then clarified that the purpose of its letter was "[t]o properly ascertain EMC's compliance." (Appellant's Amended App. vol. 1, p. 234). Under the plain meaning of "ascertain," this letter amounted to a request for further information, not a notice of breach.

Moreover, when the City mentioned the terms of the Contract in its April 18 letter,

it did not allege inadequate performance. The City stated that:

> The City of Jeffersonville advises EMC that your company is contractually responsible to *operate* and *maintain* the City's sewer treatment and collection systems in a *safe* manner pursuant to the specific provisions as set forth in Section 2 (subsections a through z; and aa through bb) of [the Contract]. In addition, the City advises EMC that pursuant to Section 2(i) of [the Contract], EMC shall be responsible for any fines or penalties assessed or imposed against the City as set forth in said subsection.

(Appellant's Amended App. vol. 1, p. 235) (emphasis in original). This paragraph specifically addressed EMC's contractual obligations yet failed to mention that the City considered EMC's performance a breach. This indicates that it was not the purpose of this letter to provide notice of a potential termination of the Contract.

In light of the above facts, we determine that the City did not provide EMC with written notice of its unsatisfactory performance before it terminated the Contract. Accordingly, we conclude that the trial court did not err in concluding that the City breached its contract with EMC.

## II. *Documentary Evidence*

In relation to EMC's alleged breach, the City also argues that the trial court abused its discretion in excluding documents and records that the City offered as evidence of EMC's failure to satisfactorily perform under the Contract. We will not address the City's argument because it is not dispositive. Each of the four documents at issue relates to EMC's performance of the Contract, which is not at issue because we have decided that Jeffersonville breached its contract with EMC for failing to provide written notice.

## III. *Open Door Violation*

Next, the City challenges the trial court's ruling that it violated Indiana's Open Door Law. Indiana's Open Door Law—codified at Indiana Code section 5–14–1.5—specifies that all meetings of governing bodies of public agencies must be open at all times for the purposes of permitting members of the public to observe and record them. I.C. § 5–14–1.5–3. The Code also mandates that a governing body must take a final action at a meeting open to the public. I.C. § 5–14–1.5–6.1(c). Under the Indiana Code, a "final action" is a "vote by the governing body on any motion, proposal, resolution, rule, regulation, ordinance, or order." I.C. § 5–14–1.5–2(g).

At trial, EMC claimed that the City violated the Open Door Law when it sent its April 18 letter and when it removed EMC from the Plant on December 1, 2008. According to EMC, these decisions constituted "final actions" by the Sewer Board that could only have been authorized in a meeting open to the public.

### A. *Statute of Limitations*

The City first presents this court with a threshold procedural question that we will address before turning to the merits of its arguments. Specifically, the City contends that EMC did not timely file its two Open Door Complaints within the 30 day time limit established by I.C. § 5–14–1.5–7(b)(2). Indiana Code section 5–14–1.5–7(b) provides that

> [r]egardless of whether a formal complaint or an informal inquiry is pending before the public access counselor, any action to declare any policy, decision, or final action of a governing body void, or to enter an injunction which would invalidate any policy, decision, or final action of a governing body, based on violation of this chapter occurring before the action is commenced, shall be commenced:

... (2) with respect to any subject matter, within thirty (30) days of either:

(A) the date of the act or failure to act complained of; or

(B) the date that the plaintiff knew or should have known that the act or failure to act complained of had occurred;

whichever is later. If the challenged policy, decision, or final action is recorded in the memoranda or minutes of a governing body, a plaintiff is considered to have known that the act or failure to act complained of had occurred not later than the date that the memoranda or minutes are first available for public inspection.

Thus, on appeal, our primary task is to determine when EMC's 30 day time limit commenced. The City presents us with three alternative arguments. First, it asserts that the 30 day period for the respective violations began when EMC received the City's April 18, 2008 and August 7, 2008 letters. The City contends that when EMC received those letters, it should have known that they were not authorized at a public meeting because EMC representatives had attended all of the public meetings of the Sewer Board during that period. Alternatively, the City characterizes the letters as official public memoranda of the Sewer Board. Since a plaintiff is considered to have known that the act or failure to act complained of has occurred no later than the date the memoranda or minutes are first available for public inspection, the 30 day time period would begin the date the letters were first available for public inspection; in other words, the date the letters were copied to the Sewer Board records, which is the date of

filing. Finally, the City argues that EMC should have known about the violations when it filed its breach of contract Complaint on August 18, 2008 because in its Complaint EMC raised the issue of whether the letters were authorized at a public meeting. Each of these alternative dates is more than 30 days prior to October 17, 2008, when EMC filed its first Open Door Complaint and December 9, 2008, when EMC filed its second Open Door Complaint.

In response, EMC argues that it had no notice or imputed knowledge of the Sewer Board's violations with respect to the letters because the Sewer Board never made authorization a part of its regular public minutes. The trial court found in favor of EMC and determined that EMC did not *actually* know that the acts were authorized outside of a public meeting until September 19, 2008.

 Based on our review of the record, we find the City's arguments persuasive. Indiana Code section 5–14–1.5–7(b) provides that the 30 day limit begins to run when the plaintiff "knew or *should have known* that the act or failure to act complained of had occurred." (emphasis added). Although this provision has never been interpreted by an Indiana court, we find the language "should have known" is clear on its face. Moreover, Indiana courts have interpreted the discovery rule concerning statutes of limitations, which is related to the issue of whether a plaintiff "should have known" of his or her injury.[3] We have held that the discovery rule "does not mandate that plaintiffs know with precision the legal injury that has been suffered, but merely anticipates that a plaintiff be possessed of sufficient information

---

**3.** The "discovery rule" states that "a cause of action accrues when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained

· as a result of the act of another." *Farmers Elevator Co. of Oakville, Inc. v. Hamilton*, 926 N.E.2d 68, 76 (Ind.Ct.App.2010), *trans. denied.*

to cause him to inquire further in order to determine whether a legal wrong has occurred." *Bambi's Roofing, Inc. v. Moriarty,* 859 N.E.2d 347, 356 (Ind.Ct.App.2006). Also,

> a plaintiff has a duty under the discovery rule to exercise reasonable diligence to discover the negligent acts or omissions. The exercise of reasonable diligence means simply that an injured party must act with some promptness where the acts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist.

*Id.*

Here, the testimony at trial demonstrates that EMC representatives attended all of the Sewer Board meetings between April 15, 2008 and the end of November, 2008. Therefore, EMC should have known, under the principles of common knowledge and experience, that the April 18 and August 7 letters were not authorized at a public meeting. The first and second Open Door Complaints were not filed until October 17, 2008 and December 30, 2008, respectively. Each of those dates is more than 30 days after the point when EMC should have known about a violation.[4]

As a result, we conclude that EMC waived its Open Door claims. We reverse the trial court's judgment with respect to this issue, and we will address the attorney's fees EMC received as a result of the trial court's judgment in a subsequent section of this Opinion.[5]

## IV. *Contempt Finding*

Next, the City argues that the trial court erred in finding it in contempt of the Agreed Entry. Specifically, the City contends that EMC acted "in bad faith and in an adversarial manner" during the mediation process by filing: (1) a notice of tort claim against the City; (2) a formal complaint against Jeffersonville with the Indiana Public Access Counselor's Office; (3) a new cause of action against Jeffersonville under Cause 984; and (4) a motion for summary judgment under Cause 984. The City asserts that—as a result of these filings—the Agreed Entry was null and void at the point when Jeffersonville removed EMC staff from its Plant, and that, therefore, EMC waived its right to assert non-compliance or contempt by the City in regards to the Agreed Entry. In response, EMC argues that no alleged violation of the Agreed Entry could automatically render the Agreed Entry null and void; alternatively, EMC contends that it merely acted to preserve its legal rights when it filed its various legal claims.

In Indiana, the determination of whether a party is in contempt of court is a matter left to the discretion of the trial court. *State ex rel. Prosser v. Indiana Waste Systems., Inc.,* 603 N.E.2d 181, 185 (Ind.Ct.App.1992). We review the trial court's decision for an abuse of discretion, and will reverse only if it is against the logic and effect of the facts and circumstances before the court and any reasonable inferences arising therefrom. *Id.*

When interpreting an agreed entry, we will recognize that such agree-

---

4. We recognize that the "final action" at issue in EMC's second Open Door Complaint was EMC's removal from the Plant, which did not occur until December 1. However, the August 7 letter warned EMC of the impending removal, therefore EMC was put on notice that the City had already authorized the removal when it received the August 7 letter.

5. Because we find that EMC waived its Open Door claims, we will not address the issue of whether the City violated Indiana's Open Door Law.

ments are contractual in nature and binding on the parties. *Singh v. Singh*, 844 N.E.2d 516, 524 (Ind.Ct.App.2006) (interpreting the effect of an agreed entry in the context of a dissolution of marriage settlement agreement); *Battershell v. Prestwick Sales, Inc.*, 585 N.E.2d 1, 4 (Ind.Ct.App. 1992), *trans. denied.* The interpretation or legal effect of a contract is a question of law to be determined by the court. *Battershell*, 585 N.E.2d. at 4–5. As we stated in a prior section above, the interpretation of a contract is controlled by the intent of the parties as expressed by the clear language of the contract. *Delgado*, 922 N.E.2d at 1270. Clear, plain, and unambiguous contract terms are conclusive of the parties' intent, and a court will not construe the contract or consider extrinsic evidence, but will merely apply the contractual provisions as they are written. *Fidelity Nat. Title Ins. Co.*, 930 N.E.2d at 1165.

 In effect, the City argues that it did not violate the Agreed Entry because EMC violated it first, and the Entry was therefore null and void. This argument goes against general logic, as well as the Rules of Trial Procedure. Logically, the obligations of a contract would be illusory if the contract were automatically void upon a breach of its terms. In addition, Indiana Trial Rule 60 provides that

> *[o]n motion* and upon such terms as are just the court may relieve a party or his legal representative of a judgment ... for the following reasons: ... (6) the judgment is void; ... The motion *shall be filed* within a reasonable time ... and not more than one year after the judgment, order or proceeding was entered. ...

(emphasis added). As is apparent through the plain meaning of the words "[o]n mo-

tion" and " *shall* be filed," a party must file a motion in order to declare an order void. *See* T.R. 60. The City never filed a motion alleging that EMC violated the Agreed Entry, so we find that the City is now precluded from arguing that the Agreed Entry was null and void, regardless of whether EMC's actions violated the Agreed Entry. In addition, as the City has not disputed that it violated the Agreed Entry, we determine that the trial court did not abuse its discretion in finding the City in contempt of the Agreed Entry.[6]

### V. Attorney's Fees

Next, we will address the issue of EMC's attorney's fees. As a result of its conclusions that the City violated the Open Door Law and acted in contempt of the Agreed Entry, the trial court awarded EMC compensation for its attorney's fees. In order to calculate the proper amount of the award, the trial court subtracted the amount of EMC's fees incurred prior to the first Open Door Law Complaint from its total fees. Based on this calculation, the trial court awarded EMC $287,735.20. On appeal, the City argues that the trial court abused its discretion in awarding compensation for fees incurred after the City's first Open Door violation without regard to whether the fees were incurred in relation to the Open Door Complaints, the contempt of the Agreed Entry, or the breach of contract Complaint. This issue is further complicated by our conclusion that the trial court erred in finding that the City violated Indiana's Open Door Law.

 We review an award of attorney's fees keeping in mind that a trial court is afforded broad discretion in awarding attorney's fees and expenses.

---

**6.** Because we do not find the issue dispositive, we will not address whether EMC also violated the Agreed Entry.

*Adler v. Adler,* 713 N.E.2d 348, 355 (Ind. Ct.App.1999). In light of that standard, we will only reverse a trial court's decision when an abuse of discretion is apparent. *Fort Wayne Lodge, LLC v. EBH Corp.,* 805 N.E.2d 876, 886 (Ind.Ct.App.2004). A trial court has abused its discretion when its decision is clearly against the logic and effect of the facts and circumstances before it. *Dempsey v. Carter,* 797 N.E.2d 268, 275 (Ind.Ct.App.2003). In addition, the amount of the trial court's award of attorney fees must be supported by the evidence. *Id.*

■■■■ The general rule in Indiana is that each party to the litigation must pay his or her own attorney's fees. *Delgado,* 922 N.E.2d at 1270. However, an award of attorney's fees may be authorized by contract, rule, statute, or agreement. *Marion–Adams School Corp. v. Boone,* 840 N.E.2d 462, 465 (Ind.Ct.App.2006). The Contract here did not provide for an award of attorney's fees, but the trial court relied on *Adler* and Indiana Code section 5–14–1.5–7(f) to compensate EMC. We held in *Adler* that once a party is found in contempt, the trial court has "the inherent authority to compensate the aggrieved party for losses and damages resulting from another's contemptuous actions." *Adler* 713 N.E.2d at 355 (quoting *Crowl v. Berryhill,* 678 N.E.2d 828, 832 (Ind.Ct. App.1997)). This compensation can include an award for attorney's fees. *See id.* Similarly, Indiana Code section 5–14–1.5–7(f) provides that "a court shall award reasonable attorney's fees, court costs, and other reasonable expenses of litigation to the prevailing party if: the plaintiff prevails . . ." in an action claiming a violation of the Open Door Law. In reviewing the trial court's decision, though, we keep in mind that statutes that provide for the award of attorney's fees are in derogation of the common law and must be strictly construed. *Town of Georgetown v. Ed-* *wards Community, Inc.,* 885 N.E.2d 722, 726 (Ind.Ct.App.2008).

■■■■ Based on these standards, we conclude that the trial court abused its discretion in calculating EMC's award of attorney's fees. The trial court only provided a legal basis to award EMC for fees incurred as a result of the City's Open Door violation and contempt claim, not EMC's breach of contract claim; nor has EMC provided such a basis. Because an award of attorney's fees is a derogation of the common law and must be strictly construed, we find that the trial court should have specifically verified that its award did not include compensation for fees incurred as a result of EMC's breach of contract claim. *See id.* Therefore, the trial court abused its discretion in awarding blanket compensation for every fee incurred after EMC's first Open Door claim, since there is evidence that EMC's attorneys worked on the contract claim after that point. Also, because we have determined that the trial court erred in finding that the City violated the Open Door Law, EMC is not entitled to attorney's fees incurred pursuing its Open Door claims. We remand to the trial court with instructions that the trial court modify its award of attorney's fees to reflect only the amount EMC incurred in relation to its contempt Complaint.

## VI. *Award of Costs*

In a related argument, the City contends that the trial court erred in ordering it to pay EMC $27,818.84 in costs "incurred for such things as postage, copying, shipping [and] delivery, computer-assisted research, travel and mileage, meals, parking, hotels, deposition expenses, supplies, and mediation expenses." (Appellant's Br. p. 18). EMC counters this argument with the assertion that those costs were remedial in nature and designed to compensate

EMC for damages incurred as a result of the contempt proceedings.

We have previously noted that costs were unknown at common law and may be awarded by a court only when they are authorized by statute. *Chapo v. Jefferson County Plan Com'n*, 926 N.E.2d 504, 508 (Ind.Ct.App.2010). Indiana Code section 34–52–1–1 is the general recovery statute and provides for the recovery of costs in all civil actions, except in those cases in which a different provision is made by law.

The issue in this case, though, is the interpretation of the term "costs." We have held that "costs" is an accepted legal term of art that has been strictly interpreted to include only filing fees and statutory witness fees. *Chapo*, 926 N.E.2d at 508. Thus, in the absence of manifest contrary legislative intent, the term "costs" must be given its accepted meaning, which does not include litigation expenses. *Id.*

In *Calhoun*, this court addressed the meaning of "costs" within the context of Indiana Trial Rule 54(D) and concluded that the recoverable costs did not include deposition transcription expenses. *Calhoun v. Hammond*, 169 Ind.App. 39, 345 N.E.2d 859, 860 (1976); *Chapo*, 926 N.E.2d at 508–09. Similarly, in *Missi* we analyzed whether the trial court erred in taxing certain litigation expenses such as deposition transcription fees, preparation and printing costs for exhibits, and photocopying expenses as recoverable costs under Indiana Trial Rule 68. *Missi v. CCC Custom Kitchens*, 731 N.E.2d 1037, 1039–40 (Ind.Ct.App.2000); *Chapo*, 926 N.E.2d at 509. We concluded that the trial court had erred because those costs were not contemplated by Trial Rule 54(D) or the general recovery statute. *Missi*, 731 N.E.2d at 1039. Most recently, in *Chapo*, we found that there was no indication that the term "costs" in Indiana Trial Rule 41(E) should be interpreted differently than

Indiana Trial Rules 54(D) or 68; as a result, we concluded that Chapo could not be reimbursed for travel expenses, postage, and photocopying costs. *Chapo*, 926 N.E.2d at 509.

 Within the context of the instant case, we find our reasoning in *Chapo* especially relevant. The only support EMC provides for the trial court's award is its argument that

> [a]wards of compensatory damages in contempt proceedings are remedial in nature designed to compensate the victim for the loss suffered by reason o[f] the contempt. Awarding costs actually incurred is no different than awarding the victim the loss he suffered by, for example, not being able to operate his business due to an act of contempt.

(Appellee's Br. p. 36). As we concluded in *Calhoun*, *Missi*, and *Chapo*, though, absent manifest contrary legislative intent, the term "costs" must be given its accepted meaning, which does not include litigation expenses. We find that the trial court erred in awarding EMC costs for litigation expenses even though the costs were partly incurred in a contempt proceeding. We reverse and remand to the trial court with instructions to modify its award of costs to EMC to reflect only EMC's filing fees and statutory witness fees.

### CROSS–APPEAL

Turning to EMC's cross-appeal, we will now analyze the issue of whether the trial court abused its discretion in calculating the damages EMC suffered as a result of the City's breach of contract. Both parties recognize that the appropriate measure of damages is EMC's net profits. *See Indianapolis City Market Corp. v. MAV, Inc.*, 915 N.E.2d 1013, 1025 (Ind.Ct.App.2009). EMC argues, however, that the trial court inappropriately calculated its net profits

because it reduced EMC's fixed costs from its actual losses.

Generally, the computation of damages for a breach of contract is a matter within the sound discretion of the trial court. *Bruno v. Wells Fargo Bank, N.A.*, 850 N.E.2d 940, 949 (Ind.Ct.App. 2006). We will not reverse a damage award upon appeal unless it is based on insufficient evidence or is contrary to law. *Id.* In determining whether an award is within the scope of the evidence, we may not reweigh the evidence or judge the credibility of witnesses. *Id.* However, we recognize that the appropriate measure of damages in a breach of contract case is the loss actually suffered as a result of the breach. *Block v. Magura*, 949 N.E.2d 1261, 1268 (Ind.Ct.App.2011). The non-breaching party is not entitled to be placed in a better position than it would have been if the contract had not been broken. *Id.*

Here, the trial court calculated EMC's net profits based on EMC's average "operating profit" rather than its average "gross margin." The difference between the operating profit and gross margin profit calculation was an expense EMC designated as "corporate support," which referred to support EMC gave to each of the operations within its corporate organization. Because the trial court subtracted EMC's corporate support expenses from its gross margin, it arrived at a lower profit for EMC, which resulted in a lower award of damages. On appeal, EMC argues that the trial court inappropriately subtracted the corporate support expenses from its gross margin because they were fixed expenses that EMC was required to pay in spite of the City's breach of the Contract. Therefore, they are not costs EMC "saved" as a result of the breach.

In support of EMC's argument, we have previously held that fixed costs should not operate to reduce a non-breaching party's damages. In *Belle City Amusements, Inc.*, Doorway Promotions, Inc. (Doorway), an event promoter, contracted with the Board of Trustees for the Allen County War Memorial Coliseum to lease the Coliseum's parking lot for use as a midway in a fair. *Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243, 245 (Ind.Ct.App.2010). Doorway also entered into an agreement with Belle City Amusements, Inc. (Belle City), an organization that provided and operated carnival rides, to present the parking lot as a midway site in 2008 and 2009 festivals. *Id.* at 246. Following the 2008 festival, Belle City requested to be released from its agreement with Doorway, but Doorway denied the request. *Id.* Belle City sent a letter to Doorway terminating the agreement, and Doorway filed a breach of contract claim against Belle City. *Id.* In the subsequent judgment, the trial court awarded damages to Doorway, including the amount of $24,000 a day for Doorway's lease of the Coliseum's parking lot. *Id.* at 248. On appeal, we upheld the trial court's judgment, determining that the amount owed under the lease was a fixed expense that Doorway was obligated to pay by contract, regardless of whether the 2009 festival occurred. *Id.* at 251. Therefore, the rent was not an expense of operation "saved" by Belle City's breach of the agreement. *Id.* at 252.

Similarly, in *Indiana Tri–City Plaza Bowl, Inc.*, we held that fixed costs should not operate to reduce a non-breaching party's award of damages. *See Indiana Tri–City Bowl, Inc. v. Glueck's Estate*, 422 N.E.2d 670 (Ind.Ct.App.1981). There, a tenant breached a settlement agreement with its landlord by unreasonably withholding its approval of a parking lot the landlord wanted to build. *Id.* at 676. On appeal, the tenant argued that the landlord's damage award should have been reduced by the amount it would have cost

the landlord to build the lot. *Id.* at 678. In our Opinion, we held that the cost of constructing the parking lot was a fixed cost that should not have been subtracted from the landlord's award for damages. *Id.*

In the case before us, the City asks us to distinguish our holding in *Belle City Amusements, Inc.* from the facts before us because Doorway in *Belle City* was obligated to pay the rent under its lease regardless of whether or not a festival occurred. In contrast, EMC was able to reallocate its corporate support to other operations within the organization, thereby cutting its actual losses. EMC calls this interpretation "pure speculation" on the City's part.

In our analysis, we recognize that the EMC's Chief Financial Officer, Gerri Kastecki (Kastecki) testified that the corporate support expenses did not disappear when the City breached the Contract. However, Kastecki's testimony also supports the City's interpretation that the support expenses were not fixed. At trial, the following exchange occurred between EMC's counsel and Kastecki:

Q: Okay. And, how was that corporate support line determined?

A: It was based upon the revenue[.] [So] if the facility one (1) was seven percent (7%) of the revenue for the organization, they got seven percent (7%) of that corporate support cost.

Q: So, in other words, there was no specific identification of individuals or line item expenses or anything like that to come up with this corporate support line?

A: No, it was allocation calculation.

(Tr. p. 47). As is apparent from this testimony, the corporate support cost was merely determined by an allocation of revenue per operation. Particular individuals were not assigned to work on each operation, and there were not any line item expenses. In light of this testimony, the City did not need to prove that EMC was able to allocate Jeffersonville's support personnel elsewhere as they were never specifically allocated to Jeffersonville in the first place. We interpret this testimony as evidence that support personnel worked for the organization as a whole and, presumably, could support different operations after the breach of contract.

We recognize that there is a potential conflict between Kastecki's two testimonies, but it is not our place to reweigh evidence on appeal. *Bruno*, 850 N.E.2d at 949. In addition, as we have noted, the trial court is granted broad discretion in awarding damages. *Id.* As a result, we cannot conclude that the trial court abused its discretion in reducing EMC's corporate support expenses from its losses during its calculation of EMC's damages.

## CONCLUSION

Based on the foregoing, we conclude that (1) the trial court did not err in finding that the City breached its contract with EMC; (2) the trial court did not abuse its discretion in excluding documentary evidence; (3) the trial court erred in finding that the City violated Indiana's Open Door Law, as EMC waived its claim by failing to file a timely complaint; (4) the trial court did not abuse its discretion in finding the City in contempt of the Agreed Entry; (5) the trial court abused its discretion in awarding EMC attorney's fees to compensate it for all fees incurred after its first Open Door Complaint; (6) the trial court erred in awarding EMC costs that included compensation for expenses other than litigation expenses; and (7) the trial court did not abuse its discretion in reducing EMC's corporate support expenses from its losses during its calculation of EMC's damages. We reverse the trial court's judgment with respect to the City's Open Door violation, its award of attor-

ney's fees, and its award of costs to EMC. We remand to the trial court with instructions that the trial court modify its award of attorney's fees and costs to EMC to include only the amount of attorney's fees EMC incurred as a result of its contempt complaint and costs reflecting EMC's losses for filing fees and statutory witness fees.

Affirmed in part, reversed in part, and remanded.

NAJAM, J. and MAY, J., concur.