# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**GEORGE T. PATTON, JR.**
**BRYAN H. BABB**
Bose McKinney & Evans, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT F. WAGNER**
**A. RICHARD M. BLAIKLOCK**
**JASON M. LEE**
**WANDINI B. RIGGINS**
Lewis Wagner, LLP
Indianapolis, Indiana

FILED

Apr 01 2013, 8:38 am

CLERK
of the supreme court,
court of appeals and
tax court

## IN THE
## COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROCHE DIAGNOSTICS OPERATIONS, INC., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 29A02-1201-PL-4 |
| | ) | |
| MARSH SUPERMARKETS, LLC, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable William J. Hughes, Judge
Cause No. 29D03-0812-PL-1481

**April 1, 2013**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Roche Diagnostics Operation, Inc. (Roche), appeals the trial court's judgment in favor of Appellee-Plaintiff, Marsh Supermarkets, LLC (Marsh).[1]

We affirm.

## ISSUES

Roche raises three issues on appeal, which we restate as:

(1)     Whether the trial court erred by denying its cross-motion for summary judgment.

(2)     Whether the trial court erred in granting judgment to Marsh based upon its conclusion that Roche breached the parties' sublease.

(3)     Whether the trial court's award of damages to Marsh was based on speculation.

## FACTS AND PROCEDURAL HISTORY

Marsh is a wholly owned subsidiary of MSI Crosspoint Indianapolis Grocery, LLC (MSI). Marsh has its headquarters at 9800 Crosspoint Boulevard, a four-story office building located in Fishers, Indiana (the Building). MSI owns the Building and the land (the Premises). Pursuant to a lease dated November 22, 2006 (Prime Lease), Marsh leases the Premises from MSI, with a right to possess and sublease the Building until 2026. In 2006, MSI mortgaged the Premises to the Bank of America (BOA).

---

[1] We held oral argument in this case on December 3, 2012 at the Indiana Court of Appeals Courtroom in Indianapolis, Indiana. We thank and commend the parties for their excellent advocacy.

2

In 2007, Roche Diagnostics Corporation, a subsidiary of Roche located in Fishers, Indiana, sought additional space and issued a request for proposals (RFP). Marsh responded to the RFP and offered to sublease the Premises. Its term sheet disclosed that it leased the Premises, which was subject to a mortgage. Marsh also offered to use "commercially reasonable efforts" to provide a non-disturbance and attornment agreement. (Appellant's App. 657). On January 31, 2008, the parties executed a letter of intent, which contained Marsh's agreement to provide "an acceptable, Subordination, Non-Disturbance and Attornment Agreement (SNDA) as an exhibit to the Sublease." (Appellant's App. pp. 664-65).

On March 28, 2008, the parties executed a sublease (Sublease) wherein Roche subleased the second through fourth floors of the Building as well as non-exclusive use of other parts of the Building. Section 1.02 of the Sublease specified the term as commencing on April 1 and expiring on November 21, 2026. Section 1.03[2] provided Roche with options to terminate at five-year anniversaries of the term, with twelve months' prior written notice and if Roche was not in default.

Pursuant to Section 2.01, Roche's obligation to pay rent commenced on January 1, 2009. In addition to other costs, operating expenses, and fees, Roche agreed to pay an annual base rent in equal monthly installments. The amount of annual base rent was $2,513,841 from January 1, 2009 to December 31, 2013; $2,587,777.50 from January 1,

---

[2] All citations herein are to either Articles or Section are to the Sublease unless otherwise indicated.

3

2014 to December 31, 2018; and $2,735,650.50 from January 1, 2019 to November 21, 2026.

Section 17.01 concerned two key ancillary documents: a subtenant recognition agreement (SRA) and an SNDA. Generally, an SRA is an agreement between the landlord and the subtenant, wherein the landlord agrees to honor the subtenant's rights in the event that the sublessor defaults under its lease with the landlord. The SNDA is an agreement between the subtenant and a mortgagee, whereby the mortgagee recognizes the subtenant's rights in the event that the landlord defaults on its obligations under the mortgage.[3] In this particular case, Roche would agree to be bound to the terms of the Prime Lease. It should be noted that although Marsh consented to the SRA, it is not a party to the SNDA; both documents are essentially between third parties to the Sublease.

The relevant text of Section 17.01 provides:

17.01 Subordination. […]. [Marsh] shall use commercially reasonable efforts to obtain a subordination, non-disturbance and attornment agreement in form as may be reasonably approved by [Roche] and [Marsh], from [BOA]. […].

[Marsh] and Roche shall cooperate in order to obtain a Subtenant Recognition Agreement ("SRA") from [MSI] and a Non-Disturbance and Attornment Agreement ["SNDA"] from [BOA]. [Roche] agrees that it

---

[3] The Seventh Circuit Court of Appeals described the features of an SNDA in a recent case:

The subordination provision subordinates the lease to the mortgage; the attornment provision requires that the tenant agree to continue the tenancy if as a result of the default and foreclosure there is a new landlord; and the nondisturbance provision assures the tenant that his lease will continue in the event of foreclosure. But nowadays, despite the name, an SNDA often and in this case contains additional provisions for the protection of the lender or the tenant.

*CW Capital Asset Management, LLC v. Chicago Properties, LLC*, 610 F.3d 497, 502-3 (7th Cir. 2010).

shall be a condition of such SRA and such [S]NDA that [Roche] agrees to be bound by the provision of the Prime Lease in the event of a termination of the Prime Lease or a foreclosure of the Mortgage. In the event that the SRA and the [S]NDA, in form and substance reasonably acceptable to Landlord, Tenant, and Prime Landlord or Prime Landlord's Mortgagee, as the case may be, is not fully executed and delivered to Tenant on or before April 25, 2008, Tenant shall have the right, exercisable on or before May 15, 2008 to terminate the Lease upon prior written notice to Landlord.

(Appellant's App. p. 119).

The parties engaged in efforts to obtain the SRA[4] and the SNDA. Roche's outside counsel, Jeffrey Abrams (Abrams), exchanged drafts of the SNDA with Marsh's outside counsel, Stephen Sussman (Sussman). Marsh's general counsel, Laura Gretencord (Gretencord), and Roche's general counsel, Steve Oldham (Oldham), also participated in the process. On March 26, 2008, Abrams provided markups after rejecting Marsh's proposed draft SNDA. On April 14, 2008, Abrams checked on the status of the SNDA. Gretencord replied that she would send the marked up SNDA to BOA. Because the SNDA would not be obtained by April 25, 2008, the parties agreed to extend the deadline.

On April 24, 2008, the parties executed the following letter amendment to the Sublease (First Extension) with the following language:

> The second paragraph of Section 17.01 [] provides that [Marsh] and [Roche] shall cooperate in order to obtain a [SRA] from [MSI] and a [SNDA] from [BOA], on or before April 25, 2008, failing which [Roche] shall have the right, exercisable on or before May 15, 2008, to terminate the [Sublease] as of such date.

---

[4] The SRA was executed by the parties on April 24, 2008. Its validity is not disputed by the parties.

5

[Marsh] and [Roche] have agreed that the date by which the SRA and the [S]NDA shall be obtained is hereby extended to May 15[], which date shall remain as the date on or before which the [Sublease] may be terminated. All other terms, covenants and conditions of the [Sublease] shall remain in full force and effect and unchanged hereby.

(Appellant's App. p. 160).

On May 2, 2008, the draft SNDA was sent by MSI's attorney to BOA's legal department.[5] On May 14, 2008, Marsh requested another extension, and on May 15, 2008, the parties executed a second extension letter (Second Extension), containing the following:

The second paragraph of Section 17.01 [] provides that [Marsh] and [Roche] shall cooperate in order to obtain a [SRA] from [MSI] and a [SNDA] from [BOA], on or before April 25, 2008, failing which [Roche] shall have the right, exercisable on or before May 15, 2008, to terminate the [Sublease] as of such date.

[Marsh] and [Roche] have agreed that the date by which the SRA and the [S]NDA shall be obtained is hereby extended to May 30[], which date shall be the date on or before which the [Sublease] may be terminated if said SRA and the [S]NDA are not obtained. All other terms, covenants and conditions of the [Sublease] shall remain in full force and effect and unchanged hereby.

(Appellant's App. p. 162).

On May 16, 2008, BOA's representative sent a revised SNDA (the May 16 SNDA) to Marsh. BOA had removed Roche's twelve month liability limit from the draft and would execute the SNDA as revised. On May 20, 2008, Abrams said this was

_____

[5] At some point, BOA had placed its mortgage on the secondary market as part of a pool of mortgages which were securitized into mortgage backed securities (MBS). BOA became trustee and master servicer under this MBS scheme and CW Capital Asset Management, LLC became the special servicer. The servicer collects individual mortgage payments and deals with the individual borrowers. This arrangement is reflected in the text of Section 17.01, wherein a "servicer" is included in the definition of "Mortgagee," *i.e.*, BOA.

unacceptable and Gretencord suggested that Abrams negotiate with BOA to obtain its desired terms. On May 22, 2008, Abrams reported to all parties that he had contacted BOA regarding the twelve-month liability limit.

On May 28, 2008, Abrams emailed Gretencord to follow up and suggested that the parties execute a further extension; however, Abrams noted that Roche could not continue waiting for the SNDA. On May 29, 2008, Gretencord prepared another extension. Meanwhile, Roche internally decided it no longer wanted to sublease the Building and Oldham prepared a termination letter. On May 29, 2008, Oldham sent Roche's termination letter to Marsh via overnight courier. The termination letter was received in the Marsh mailroom at 10 a.m. the following day. After learning Roche's position from Oldham directly, Gretencord contacted BOA to obtain a SNDA containing a twelve month liability limit. BOA and CW Capital Asset Management, LLC, the special servicer, agreed and the SNDA (the May 30 SNDA) was executed and forwarded to Marsh, which hand delivered it to Roche at 4:57 p.m., along with a cover letter stating that Roche's termination was null and void.

On June 12, 2008, Roche sent Marsh its response, denying that it was in default and asserting that it had validly exercised its right to terminate. On June 24, 2008, Gretencord sent Roche a letter advising that Roche was in default of the sublease.

On July 8, 2008, Marsh filed its Complaint against Roche alleging breach of contract, which it later amended. On September 18, 2008, Roche filed its Answer and Counterclaim, which it later amended. On February 23, 2009 and March 30, 2009,

Marsh and Roche, respectively, moved for summary judgment. On October 19, 2009, the trial court denied both parties' motions for summary judgment. Although the trial court declined to rule on the parties' differing interpretations of Section 17.01 and the Extensions, it found that a genuine issue of material fact "whether each party discharged its half of the mutual obligation to cooperate in acquiring the [S]NDA." (Appellant's App. p. 28).

From September 26, 2011 through October 4, 2011, a bench trial was held. On December 6, 2011, the trial court granted Judgment to Marsh. The trial court concluded that the Sublease and Extensions were valid and that the Extensions eliminated Roche's unilateral termination option under Section 17.01. As a result, Roche was obligated to wait until May 30, 2008 to receive an SNDA. However, by refusing to accept either the May 16 SNDA or the May 30 SNDA, the trial court concluded that Roche breached the Sublease. Referring to the default provisions in Section 16.01, the trial court further concluded that Roche was in default.

Next, the trial court determined that both common law and Article 16 provided "Marsh [with] several cumulative and non-exclusive remedies as a result of Roche's default." (Appellant's App. p. 64). Under common law, the trial court concluded that a lessee in breach "is liable for all rent remaining under a lease after the lessee vacates the property." (Appellant's App. p. 64). Under Section 16.02, should Roche default, Marsh was entitled to affirm the lease and claim damages, included the balance of rental payment due under the Sublease. Concluding that Section 1.03 unambiguously provided

8

the term of the Sublease, the trial court calculated that Marsh's "gross losses resulting from Roche's failure to pay rent under Sublease total $47,165,326." (Appellant's App. p. 66).

The trial court then "set off the amount of damages mitigated by Marsh," consisting of present and future rental payments from a subsequent sublease between Marsh and First Advantage Background Services Corporation (First Advantage). (Appellant's App. p. 64). The sublease between Marsh and First Advantage Sublease commenced on October 1, 2011 and expires on July 31, 2019; however, First Advantage has options to extend the term for an initial four year period and a subsequent period of three years and two months. As a result, the trial court determined that "Marsh's net damages, not adjusted for present value, equal $23,077,898." (Appellant's App. p. 69). Using a discount rate of 6%, the present value of Marsh's damages was determined to be $17,743,568. After adding prejudgment interest and subtracting inapplicable costs, the trial court awarded $18,188,933 to Marsh.

Roche now appeals. Additional facts will be provided as necessary.

### DISCUSSION AND DECISION

#### I. *Cross-Motion for Summary Judgment*

Roche first argues that the trial court erred by denying its cross-motion for summary judgment. Specifically, it contends that the trial court erred by failing to determine as a matter of law that under the plain language of Section 17.01 and the Extensions Roche properly terminated the Sublease. Roche also asserts that the trial

9

court erred in determining that genuine issues of material fact existed regarding the parties' obligations to cooperate in obtaining the SNDA.

## A. *Standard of Review*

We first note that although this case proceeded to trial and the trial court entered a final judgment on Marsh's claims, we may still review the trial court's ruling on Roche's cross-motion for summary judgment. *See Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 501 (Ind. Ct. App. 2007). A party that fails to bring an interlocutory appeal from the denial of a motion for summary judgment may still pursue appellate review after an entry of final judgment because the denial of the motion places the parties' rights in abeyance pending ultimate determination by the trier of fact. *Id*.

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *Ogden v. Robertson*, 962 N.E.2d 134, 140 (Ind. Ct. App. 2012), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. A fact is material if its resolution would affect the outcome of the case. *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009). An issue is genuine if a trier

10

of fact is required to resolve the parties' differing accounts of the truth or if the undisputed facts support conflicting reasonable inferences. *Id*.

Here, the trial court issued findings of fact and conclusions of law in support of its denial of the parties' cross-motions. However, the trial court's findings on summary judgment are not binding on appeal. *Myers v. Coats*, 966 N.E.2d 652, 656 (Ind. Ct. App. 2012). Although an aid to appellate review, the trial court's findings and conclusions merely afford the appellant an opportunity to address the merits of the trial court's rationale. *Id*.

As undisputed facts, the trial court found that the parties had entered into the Sublease; that Section 17.01 governed "acquisition of [the SRA and the SNDA]" and "a conditional right to terminate in favor of Roche if an SRA and NDA, each "fully-executed" and "reasonably acceptable," were not delivered to Roche on or before April 25." (Appellant's App. pp. 23-4). Both Extensions were "duly executed in accordance with Sublease" on April 24, 2008 and May 15, 2008 respectively.

B. *Analysis*

1. *Interpretation of Section 17.01 and the Extensions*

Roche's initial challenge to the trial court's denial of its cross-motion for summary judgment turns on the interpretation of the Extensions. Indiana courts have recognized the contractual nature of leases and the applicability of the law of contracts to leases. *Village Commons, LLC v. Marion County Prosecutor's Office*, 882 N.E.2d 210, 215 (Ind. Ct. App. 2008), *trans. denied*. The interpretation or legal effect of a contract is a question

11

of law to be determined by the court. *City of Jeffersonville v. Environmental Management Corp.,* 954 N.E.2d 1000, 1012 (Ind. Ct. App. 2011).

In Indiana, the interpretation of a contract is controlled by the intent of the parties as expressed by the clear language of the contract. *Id*. at 1008. Clear, plain, and unambiguous contract terms are conclusive of the parties' intent, and a court will not construe the contract or consider extrinsic evidence, but will merely apply the contractual provisions as they are written. *Id*. Moreover, a document is not ambiguous simply because the parties disagree concerning the proper interpretation of the terms. *Id*. A contract is ambiguous only if a reasonable person could find its terms susceptible to more than one interpretation. *Id*.

The parties do not dispute that the last paragraph of Section 17.01 unambiguously provided Roche with a unilateral option to terminate the Sublease. That language is clear and unambiguous: if a "fully executed" SNDA, in form and substance acceptable to Roche, Marsh, MSI and BOA, was not delivered to Roche by April 25, 2008, Roche's unilateral option to terminate vested. (Appellant's Addendum Tab 1). Thus, Roche had until May 15, 2008 to exercise its option and was required to do so upon prior written notice. Provided that no compliant SNDA was delivered to it by April 25, 2008, Roche could terminate the Sublease whether or not a compliant SNDA was thereafter delivered.

The parties' dispute thus narrows to the interpretation and effect of the First and Second Extensions. While referencing Roche's option to terminate under Section 17.01, the Extensions transferred the SNDA delivery date to May 15, 2008 (First Extension) and

12

later to May 30, 2008 (Second Extension).  This created a new agreement as evidenced

by the following language:

> First Extension:
>
> The second paragraph of Section 17.01 of the [Sublease] provides that [Marsh] and [Roche] shall cooperate in order to obtain a [SRA] from [MSI] and a [SNDA] from [BOA], on or before April 25, 2008, failing which [Roche] shall have the right, exercisable on or before May 15, 2008, to terminate the [Sublease] as of such date.
>
> [Marsh] and [Roche] have agreed that the date by which the SRA and the [SNDA] *shall be obtained* is hereby extended to May 15, 2008, which date shall remain as the date on or before which the [Sublease] may be terminated.

(Appellant's Addendum Tab 2)(emphasis added).  The Second Extension mirrors the

First Extension's second paragraph and goes on to provide that:

> [Marsh] and [Roche] have agreed that the date by which the SRA and the [SNDA] shall be obtained is hereby extended to May 30, 2008, which date shall remain as the date on or before which the [Sublease] may be terminated if said SRA and the [SNDA] are not obtained.

(Appellant's Addendum Tab 3).  Both extensions further state that all other "terms,

covenants and conditions of the [Sublease] shall remain in full force and effect and

unchanged hereby."  (Appellant's Addendum Tabs 2 & 3).

Roche contends that the language of the Extensions created a race whereby Roche

could exercise its option to terminate the Sublease so long as it did so before a compliant

SNDA was delivered.  The parties characterized this interpretation as the 'race theory.'

Under its race theory, Roche argues that Section 17.01 provided two deadlines:  April 25,

2008, the date its right to terminate vested (Vesting Date); and, May 15, 2008, the last

13

day it could exercise such right (Exercise Date). In Section 17.01, Roche had the right to terminate "on or before" May 15, 2008. As the Extensions both retained the phrase "on or before," Roche asserts that the First Extension "collapsed" the Vesting Date into the Exercise Date. It asserts that the Second Extension kept this arrangement but extended the deadline to terminate to May 30. In other words, Roche's interpretation boils down to delivery of the SNDA before it exercised its right to terminate the Sublease.

Marsh argues that the Extensions simply reassigned both the vesting and exercise dates for Roche's option to terminate. Marsh contends that Roche's interpretation is illogical because it simultaneously acknowledges a unilateral right to terminate, yet eviscerates that right by creating a race. Instead, it maintains Roche only had the right to terminate before May 30, 2008 if the SNDA proved impossible to obtain, such as if BOA refused to execute it. Marsh also contends that Roche's "race-theory" ignores the requirement in Section 17.01 that the parties mutually cooperate to obtain the SNDA. Thus, if Roche could win the "race" by delivering notice of termination, it would render the expressed duty to cooperate meaningless.

Construction of the terms of a written contract is a pure question of law for the court. *Barrington Management Co., Inc. v. Paul E. Draper Family Ltd. Partnership*, 695 N.E.2d 135, 140 (Ind. Ct. App. 1998). In interpreting a written contract, the court should attempt to determine the intent of the parties at the time the contract was made as discovered by the language used to express their rights and duties. *Id*. The contract is to be read as a whole when trying to ascertain the intent of the parties. *Id*. The court will

14

make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Id.* Finally, the court must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes the provisions to be conflicting. *Id.*

Roche argues that the language of the Extensions unambiguously preserved its termination option under Section 17.01. We disagree. Instead, we conclude the Extensions unambiguously modified Roche's option to terminate under Section 17.01. The last paragraph of Section 17.01 provided two deadlines: (1) that a compliant SNDA was to be delivered to Roche by April 25, 2008, and (2) if not, Roche could terminate the Sublease, but had to do so on or before May 15, 2008. The third paragraphs of both Extensions changed the first part of the last paragraph in Section 17.01 by specifying that the SNDA "shall be obtained" by May 15 or May 30, 2008. The third paragraphs of both Extensions thus changed the second part of the last paragraph in Section 17.01 by transferring the date on which Roche could exercise its option to terminate to May 15 and then May 30, 2008. The effect of such modifications was to extinguish Roche's ability to unilaterally determine whether and when it could terminate the Sublease. The Extensions therefore modified the parties' agreement and instead Roche's receipt of a compliant SNDA determined whether it could terminate the Sublease.

This is consistent with the language in Section 17.01, which established delivery of the SNDA to Roche as the triggering event for its unilateral termination option to arise. However, that act was to first occur on April 25, 2008 (Section 17.01), then on May 15,

15

2008 (First Extension) and finally on May 30, 2008 (Second Extension). Roche's ability to unilaterally terminate therefore became a casualty of the parties' subsequent agreements, as embodied by the Extensions, which reassigned the dates when the act of delivering a compliant SNDA must occur.

This interpretation is supported by the law on contractual conditions, which defines a condition as an act or an event, not merely the passage of time. Specifically, RESTATEMENT (SECOND) OF CONTRACTS § 224, cmt. b (1981) provides in relevant part:

> [T]here is inherent in the concept of condition some degree of uncertainty as to the occurrence of the event. Therefore, the mere passage of time, as to which there is no uncertainty, is not a condition and a duty is unconditional if nothing but the passage of time is necessary to give rise to a duty of performance. Moreover, an event is not a condition, even though its occurrence is uncertain, if it is referred to merely to measure the passage of time after which an obligor is to perform.

Here, the Extensions contained the parties' agreement to shift the date when the act of obtaining an SNDA occurred. An interpretation that Roche somehow retained its unilateral termination option under Section 17.01 is unsustainable in light of the clear language of the Extensions which transferred the date of the relevant act to April 25, then May 15, and finally May 30, 2008. In sum, it is the act, not the date, which determines whether Roche possessed the option to terminate the Sublease.

Roche's arguments for a contrary interpretation fail to persuade us. First, as Marsh points out, Roche's race theory is inherently inconsistent with its insistence that the Extensions preserved its discretionary termination option under Section 17.01. An unconditional right to terminate on April 25, 2008, cannot coexist with a self-professed

16

race to deliver a compliant SNDA on or before May 15 or May 30, 2008. Indeed, there would be no need for the First Extension to allow more time to obtain the SNDA if Roche intended that its heretofore unconditional option to terminate were to remain in force. Roche concedes this when it argues that the only change occasioned by the Extensions "was that Marsh could cure its prior failure if it delivered the executed SNDA prior to termination." (Appellant's Br. p. 21). Suggesting that a cure exists removes the element of the discretion that had been provided to Roche under Section 17.01. Roche's argument is therefore tantamount to a concession that its option under Section 17.01 became wholly determinative on whether delivery of the SNDA occurred before the deadline.

We also reject Roche's reliance upon the language in the Extensions that either May 15 or May 30, 2008 "shall be the date on or before which the [Sublease] may be terminated if said SRA and [SNDA] are not obtained." (Appellant's Addendum Tabs 2 & 3). Although Roche argues that a contrary interpretation would render this phrase meaningless, its argument is nothing more than a seemingly hypnotic repetition of the words "on or before" done with the hope of persuading us that the Extensions did not modify Roche's discretionary right to terminate under Section 17.01. The mere fact that the phrase was carried over from Section 17.01 to the Extensions does not, in and of itself, demonstrate that Roche's discretionary termination option had not been forfeited. Instead, we view the phrase as fixing the date by which, under the new contractual arrangement, Roche's termination option may be effected albeit without the absolute

17

discretion afforded it under Section 17.01. Furthermore, we reject Roche's assertions that it would not forfeit its termination option under Section 17.01 without receiving something in return and that a contrary interpretation would force Roche to wait until "11:59:59 p.m. of the last day of the time period for Marsh to provide the document." (Appellant's Br. p. 27). It is not for us to determine the wisdom of the parties' contractual bargain or the drafting of the language expressing such bargain. Sophisticated commercial actors should be free to allocate risks as they see fit, and courts should not interfere simply because such risks have materialized. *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 746 N.E.2d 941, 950-51 (Ind. 2001). Further, it is common enough for parties to send advance notice of their intent to do an act that will have operative effect in the future. The language of Section 17.01 requires this by specifying that Roche's termination can occur only upon prior written notice.

In sum, we conclude that the Extensions contain the parties' clear intent for Roche to have its termination option effective only upon a failure to deliver a compliant SNDA by May 30, 2008. This conclusion rests upon the language of the Extensions that modified Roche's unilateral option to terminate under Section 17.01. Therefore, the trial court did not err by denying Roche's cross-motion for summary judgment as a matter of law, and Roche's arguments to the contrary fail.

2. *Genuine Issue of Material Fact*

Roche also argues that the trial court erred in finding a genuine issue of material fact regarding the parties' mutual obligation to cooperate in obtaining the SNDA. First, it

18

contends that since Section 17.01 obligated Marsh to use commercially reasonable efforts to obtain the SNDA and the designated evidence purportedly shows that it did not do so, no genuine issue of material fact existed on the parties' cooperation. Second, Roche argues that the trial court improperly relied on the parties' contractual duty to cooperate as the basis to find a dispute of material fact.

In denying Roche's cross-motion, the trial court declined to give effect to either party's interpretation of the Extensions. However, it concluded that "[n]either [Extension] modified the Sublease's original requirement that the parties "shall cooperate in order to obtain" the [S]NDA." (Appellant's App. pp. 24-25).[6] Finding "that the designated evidence supports reasonable inferences that neither Marsh nor Roche cooperated as required by the second paragraph of Section 17.01 of the Sublease," the trial court concluded that a genuine issue of material fact existed regarding the parties' covenant to mutually cooperate in obtaining the SNDA. (Appellant's App. p. 28).

The party appealing the trial court's denial of summary judgment bears the burden of persuading us that the trial court erred. *Irvine v. Rare Feline Breeding Center, Inc.*, 685 N.E.2d 120, 123 (Ind. Ct. App. 1997), *trans. denied*. The denial of summary judgment will be affirmed if it is sustainable on any theory or basis found in the evidentiary matter designated to the trial court. *Beradi v. Hardware Wholesalers, Inc.*,

---

[6] Marsh has filed an Appellee's Motion to Strike, asking us to strike statements in Roche's brief that Marsh asserts are based on evidence not specifically designated to the trial court. Roche has filed an Appellant's Response to Appellee's Motion to Strike. We do not rely on any of the challenged statements in resolving this appeal; therefore, we denied the Motion to Strike as well as Marsh's Motion for Leave to File a Reply by separate order issued prior to this opinion.

625 N.E.2d 1259, 1261 (Ind. Ct. App. 1993), *trans. denied*. We agree with the trial court that genuine issues of material fact existed.

Whether an act constitutes a termination of an agreement, and thus is a breach, is often a question of fact, making summary judgment inappropriate. *Hendershot v. Indiana Medical Network, Inc.,* 750 N.E.2d 798, 804 (Ind. Ct. App. 2001). Further, whether a party has committed a material breach of contract is a question of fact, the resolution of which is dependent on several factors. *Anderson v. Horizon Homes*, Inc. 644 N.E.2d 1281, 1290 (Ind. Ct. App. 1995), *trans. denied*.

First, Roche asserts that the undisputed evidence shows that Marsh failed to use commercially reasonable efforts to obtain the SNDA and by ignoring Marsh's obligation, the trial court improperly elevated this contractual obligation over the parties' duty to cooperate. However, commercial reasonableness is a question of fact. *See Morris v. Lyons Capitol Resources, Inc.*, 510 N.E.2d 221, 224 (Ind. Ct. App. 1987). Moreover, different obligations within a contract represent separate covenants making the fulfillment of those covenants, and therefore the question of breach, a separate question. Roche acknowledges this by conceding that "[b]oth provisions must be given effect." (Appellant's Br. p. 31). We therefore reject Roche's attempt to confuse the issue.

Second, Roche contends that the trial court's determination on whether Roche made a good faith effort to cooperate under Section 17.01 of the Sublease was improperly based upon the *Hamlin* doctrine. The *Hamlin* doctrine is derived from *Hamlin v. Steward*, 622 N.E.2d 535 (Ind. Ct. App. 1993), and stands for the proposition that while

20

ordinarily there is no implied duty to perform in good faith, if the failure of a condition precedent results from a party's inaction, such party may not rely on the failure to avoid the contract. *Id*. at 540-41. Because there was no dispute that an underlying debt was owed in *Hamlin*, but only when payment would be due, which was in control of the debtor, this court held that "we must infer good faith in the performance of the condition in order to give meaning to the intention of the parties;" otherwise, the promise is illusory. *Id*. at 541.

Roche contends that by denying summary judgment, the trial court impliedly tied its right to terminate to the parties' mutual obligation to cooperate in obtaining the SNDA. It distinguishes *Hamlin* by arguing that *Hamlin* involved a contingency that was not certain to occur, whereas the case at bar involved three definite deadlines to obtain the SNDA: April 25, 2008 (Section 17.01), May 15, 2008 (First Extension), and May 30, 2008 (Second Extension). Roche also contends that there was no reason to imply a good faith obligation because the parties' obligations were spelled out in Section 17.01. Finally, Roche asserts that obtaining the SNDA was not wholly within its control and therefore its obligation to cooperate was not illusory. With respect to the latter point, Roche cites *Pardieck v. Pardieck*, 676 N.E.2d 359, 364 n.3 (Ind. Ct. App. 1997), which distinguished *Hamlin* in the context of a married couple's mutual obligation to build up marital property. Consequently, Roche argues that its insistence on its right to terminate did not cause the failure of the condition precedent, and therefore *Hamlin* is inapposite.

Marsh argues that Roche had sufficient control to make the *Hamlin* doctrine applicable because it could have approved the May 16 draft SNDA and requested BOA to execute it. Marsh also contends that it was up to Roche by May 22 to convince BOA to agree to Roche's demands or accept BOA's version, and that Roche chose not to sign the executed SNDA delivered by Marsh at 4:57 p.m. on May 30. Further, even if *Hamlin* does not require sole control, Marsh asserts that additional Indiana precedent contains that requirement and cites *Billman v. Hensel*, 391 N.E.2d 671, 673 (Ind. Ct. app. 1979), in support. *Billman* predates *Hamlin*, but the *Billman* court found an implied obligation to make a reasonable and good faith effort to satisfy a condition precedent in the context of a buyer obtaining finance. *Id*.

We agree with Roche in part; however, the *Hamlin* doctrine is relevant when evaluating the parties' duty of cooperation following Roche's rejection of the May 16 SNDA. In *Ind. State Hwy Comm'n v. Curtis*, 704 N.E.2d 1015, 1019 (Ind. 1998), the supreme court applied the *Hamlin* doctrine in the context of third party approval of a settlement agreement. The *Curtis* court pointed out that not "every failure of a condition results in an estoppel against asserting the condition as a proper reason to avoid the contract." *Id*. While "the *Hamlin* doctrine prevents a party from acts of contractual sabotage or other acts in bad faith by a party that cause the failure of a condition," "where the condition is itself the approval by some division or component of the party, however, the obligation is only to consider that approval in good faith." *Id*.

22

We conclude that there is no issue of genuine fact regarding Roche's rejection of the May 16 SNDA. Faced with the possibility that it would be required to assume Marsh's obligations under the Prime Lease, Roche had bargained for a twelve-month limitation in both the SRA and the SNDA. It received such limitation in the SRA; thus, it was reasonable for Roche to insist upon an SNDA consistent with its contractual requests. Accordingly, its rejection of the May 16 SNDA did not constitute a breach of the failure to cooperate.

We reach a different result regarding the May 30 SNDA. Each contended that the other failed to cooperate under Section 17.01. The parties designated evidence on each party's actions after Roche rejected the May 16 SNDA. The designated evidence includes Marsh's actions or lack thereof following Roche's receipt of the May 16 SNDA; Abrams' May 29, 2008 email which discussed a possible third extension of the SNDA deadline; and Roche's actions immediately before and following the May 30 SNDA. Given the parties' different views, we agree with the trial court that the designated evidence gave rise to reasonable inferences that the parties breached their cooperation obligation regarding the May 30 SNDA. We therefore conclude that a genuine issue of material fact existed. The trial court did not err in denying Roche's cross-motion for summary judgment.

## II. *Judgment*

Roche next contends that the trial court's Judgment is erroneous. Specifically, it challenges the trial court's construction of the Sublease and the Extensions as a matter of

23

law, the trial court's determination that its actions constituted a breach, and that it was in default of its obligations under the Sublease.

The essential elements of a breach of contract action are 1) the existence of a contract, 2) the defendant's breach thereof, and 3) damages. *Ruse v. Bleeke*, 914 N.E.2d 1, 11 (Ind. Ct. App. 2009). In determining that Roche breached the Sublease, the trial court first construed the Sublease and the Extensions as requiring that Roche receive a SNDA by May 30, 2008. In particular, it determined that the Extensions "simply reassigned the dates by which one party (Marsh under the [First Extension]) or both parties (Marsh and Roche under the [Second Extension]) were granted to fulfill the conditions set forth in Section 17.01 or terminate the lease if the conditions were not met." (Appellant's App. p. 55).

The trial court next concluded that Roche committed separate breaches of the Sublease. First, "Roche refused to accept the SNDA delivered to Roche by Marsh on May 30 that satisfied the provisions of Section 17.01 of the Sublease." (Appellant's App. p. 54). Second, "Roche refused to request execution of the SNDA that satisfied the provisions of Section 17.01 of the Sublease received from BOA on May 16." (Appellant's App. p. 54). Third, "Roche failed to satisfy its obligation to cooperate to obtain the SNDA as required by Section 17.01 of the Sublease." (Appellant's App. p. 54). Fourth, under *Hamlin v. Steward*, 622 N.E.2d 535 (Ind. Ct. App. 1993), Roche could not rely on the failure of a condition precedent to excuse its performance.

A. *Standard of Review*

The parties each dispute which standard of review applies. Roche claims that the standard of review should be a *de novo* review of contract interpretation, whereas Marsh insists upon a clearly erroneous standard pursuant to Ind. Trial Rule 52(A). Here, the trial court issued findings of fact and conclusions of law in support of its judgment and upon request from the parties. While both parties focus on selective provisions of our standard of review pursuant to Ind. Trial Rule 52(A), we find such distinctions unnecessary and a needless distraction as they simply emphasize different aspects of our review, which is well settled under T.R. 52(A).

The trial court entered findings of fact and conclusions thereon pursuant to Trial Rule 52(A) at the request of the parties, and thus, we apply a two-tiered standard of review: first, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Briles v. Wausau Ins. Co.*, 858 N.E.2d 208, 212 (Ind. Ct. App. 2006), *trans. denied*.

We will not disturb the trial court's findings or judgment unless they are clearly erroneous. *Walsh & Kelly, Inc. v. Int'l Contractors, Inc.*, 943 N.E.2d 394, 398 (Ind. Ct. App. 2011), *trans. denied*. Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them, and the trial court's judgment is clearly erroneous if it is unsupported by the findings and the conclusions which rely upon those findings. *Briles*, 858 N.E.2d at 212. In establishing whether the findings or the judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Id*.

25

While conducting our review, we cannot reweigh the evidence or judge the credibility of any witness, and must affirm the trial court's decision if the record contains any supporting evidence or inferences. *Id*. However, while we defer substantially to findings of fact, we do not do so for conclusions of law. *Id*. We evaluate conclusions of law *de novo* and owe no deference to a trial court's determination of such questions. *Id*.

Furthermore, because Marsh bore the burden of proof at trial and prevailed, Roche appeals from an adverse judgment. *See McCauley v. Harris*, 928 N.E.2d 309, 313 (Ind. Ct. App. 2010), *trans. denied*. When the trial court enters findings in favor of the party bearing the burden of proof, the findings are clearly erroneous if they are not supported by substantial evidence of probative value. *Id*. Thus, this court will affirm a judgment where it finds substantial supporting evidence, unless it is left with a definite and firm conviction that a mistake has been made. *See id*.

## B. *Analysis*

### 1. *Interpretation of Section 17.01 and the Extensions*

The trial court concluded that the Sublease and the Extensions unambiguously stated that Roche could terminate the Sublease only if it did not receive a compliant SNDA by the end of day, May 30, 2008. While Section 17.01 created a unilateral termination option in favor of Roche, the trial court concluded that the Extensions unambiguously permitted termination "ONLY IF both documents in a form and substance reasonably acceptable to [Marsh], [Roche], [MSI] and [BOA] were not fully

26

executed and delivered on or before" May 15 and later May 30. (Appellant's App. p. 35).

Conclusion of Law No. 74 sums up the trial court's interpretation as follows:

> 74. […]. [T]he Sublease and its two [Extensions] are unambiguous: Roche had no right to terminate the Sublease unless, by the end of the day on May 30, 2008, the parties had not obtained a fully executed SNDA (the SRA had already been obtained) in form and substance reasonably acceptable to Marsh, Roche and [BOA]. In order to exercise the right of termination in the event the condition was not met, Roche was required to give Marsh prior written notice of its intent to terminate if the SNDA had not been obtained. There is no ambiguity in this language, but if there was an ambiguity in the Sublease, as amended, then the objective evidence of the parties' intent that they exchanged during the drafting process leads to this same conclusion. Because Marsh delivered to Roche a fully executed SNDA in form and substance reasonably acceptable to Marsh, Roche and [BOA] on May 30, 2008, before 5:00 p.m., Roche had no right to terminate the Sublease. Because Marsh met the condition of delivery of the SNDA by May 30, 2008 Roche's conditional right of termination never arose.

(Appellant's App. pp. 56-57).

Roche's challenge to the trial court's conclusion is essentially the same as its argument on the denial of its cross-motion for summary judgment. Roche argues that the trial court ignored the "on or before" language in Section 17.01 and the Extensions, thereby taking away Roche's right to terminate. According to Roche, it would have to wait until the last nanosecond to terminate, even if it had received a non-compliant SNDA from Marsh earlier. In response, Marsh argues that the trial court's interpretation is correct in declining to "elevate Roche's conditional right to terminate into an unconditional [right] subject to a race-win." (Appellee's Br. p. 26).

We have already interpreted Section 17.01 and the Extensions as a matter of law. In our view, the Extensions modified Roche's conditional right to terminate the Sublease.

27

The language of both the First and Second Extensions moved the date of the act, procurement of a compliant SNDA, to May 15, 2008 and then May 30, 2008. As a result, Roche's unilateral termination option, vesting as it did under Section 17.01 on April 25, 2008, was thereafter modified by parties' agreement as expressed in the Extensions. By first agreeing that the date to obtain the SNDA be extended to May 15 under the First Extension and later agreeing to extend to May 30, 2008 under the Second Extension, Roche relinquished its unilateral termination option under Section 17.01. We therefore conclude that the trial court's interpretation of Section 17.01 as modified by the Extensions was correct as a matter of law.

## 2. *Duty to Cooperate*

Next, Roche argues that the trial court erroneously found that Roche did not cooperate. The trial court found that Section 17.01 imposed a mutual obligation duty of cooperation on both parties and Roche breached such duty by not accepting the May 16 SNDA or the May 30 SNDA, both of which the trial court deemed compliant with Section 17.01. The trial court concluded that under *Hamlin*, Roche had an obligation on May 29 to cooperate in good faith. Specifically, the trial court concluded that "[b]y May 29," "Roche's conduct was focused solely on terminating the Sublease, and it undertook no further steps to cooperate to obtain the SNDA." (Appellant's App. p. 59). The trial court also characterized Roche's conduct as lulling Marsh into believing that a third extension of the deadline would occur.

28

Roche's dispute of the trial court's conclusion that it did not cooperate is premised upon its insistence that its unilateral termination option under Section 17.01 was preserved by the Extensions. We have determined that no such right was preserved. Consequently, we limit our review to whether there is substantial evidence to support the trial court's findings, whether the findings fail to support the judgment, and whether the trial court applied the wrong legal standard to properly found facts. *See Fraley v. Minger*, 829 N.E.2d 476, 482 (Ind. 2005).

In concluding that Roche breached its duty to cooperate regarding the SNDA, the trial court found the following facts. On May 16, 2008, Gretencord sent Oldham and Abrams the May 16 SNDA. The May 16 SNDA did not contain Roche's desired twelve-month limitation to be bound to the Prime Lease. On May 20, 2008, Abrams informed Gretencord that Roche rejected the SNDA. Following Gretencord's suggestion, on May 22, 2008, Abrams contacted BOA to obtain the twelve-month limitation. On May 22, 2008, Abrams informed Gretencord and Oldham that BOA was considering Roche's position and that he informed BOA that the parties were "under a tight time frame to resolve by next Friday," May 30, 2008. During May 22 through May 28, 2008, neither party followed up with BOA. However, on May 28, 2008, Abrams emailed Gretencord that

> [O]nce again we come up against a deadline for the SNDA from your landlord's lender and we have nothing as of today. I am out as of 2:30 tomorrow and [F]riday so we probably need another extension but not sure how much longer Roche can keep going in limbo, spending money and moving people, etc[.,] if they do not have a deal that works for them.

29

Please prepare another letter to extend the time to terminate for one more week and push your contacts to get us some response.

(Joint Trial Exh. No. 125).

That same day, Gretencord emailed Abrams requesting the status of his discussion with BOA and on May 29, 2008, Abrams informed Gretencord that BOA was waiting on any response of the servicer to the SNDA. That same day, several significant events occurred: Gretencord prepared another extension and Roche prepared and sent its notice of termination. Thereafter, Roche made no effort to obtain an SNDA. Nor did Roche inform Marsh that it intended to terminate the Sublease. Instead, Roche sent its notice of termination to an overnight courier. On May 30, 2008, after Gretencord learned of the termination notice, Marsh delivered to Roche an SNDA containing Roche's desired twelve-month limitation yet Roche refused to sign it. Roche does not challenge these findings but only their interpretation. Thus, we conclude that the foregoing findings are amply supported by the parties' email exchanges and testimony at trial.

Based on these findings the trial court concluded that Roche failed to fulfill its duty under Section 17.01 to cooperate in obtaining the SNDA and that such failure constituted a breach. We disagree, however, that Roche's rejection of the May 16 SNDA constituted a breach of the duty to cooperate. As we have already recognized, the duty imposed under the *Hamlin* doctrine requires only that where a condition is based on a third party's approval, "the obligation is only to consider that approval in good faith." *Curtis*, 704 N.E.2d at 1019. Here, BOA provided the May 16 SNDA, which constituted its approval of terms that it was willing to accept. Yet, the May 16 SNDA did not contain

30

the twelve-month limitation that Roche had consistently insisted upon. Given the possible assumption of the Prime Lease and the *Curtis* requirement to consider third party approvals in good faith, we cannot conclude that Roche breached the Sublease by declining to accept the May 16 SNDA.

Nevertheless, the findings support the conclusion that Roche breached the Sublease by its conduct surrounding the May 30 SNDA. On May 29, 2008, Roche chose not to inform Marsh that it intended to terminate the Sublease if the SNDA was not obtained. Yet, earlier that day Roche's counsel requested another extension of the deadline to obtain an SNDA. Upon receipt of a compliant SNDA on May 30, 2008, Roche did not accept it. Consequently, we conclude that the trial court properly determined that Roche breached its duty to cooperate regarding the May 30 SNDA and find no error with the trial court's conclusion that such failure constituted a breach of the Sublease.[7]

## III. *Damages*

Finally, Roche appeals the trial court's award of damages. The trial court concluded that "[b]ecause Roche is in default of the Sublease, the unambiguous term of the Sublease for purposes of assessing damages runs through November 21, 2026." (Appellant's App. p. 66). Calculating the present value of the remaining rents under the

---

[7] Roche also argues that the trial court incorrectly concluded that its refusal to execute the May 16 SNDA constituted a default under Article 16. Because we conclude that Roche did not breach the duty of cooperation by refusing to execute the May 16 SNDA, we find it unnecessary to address this argument.

Sublease and prejudgment interest and deducting amounts mitigated by Marsh and inapplicable costs, the trial court awarded Marsh $18,188,933.

## A. *Standard of Review*

The trial court's award of damages is subject to review for an abuse of discretion. *City of Jeffersonville,* 954 N.E.2d at 1015. This court will not reverse a damage award upon appeal unless it is based on insufficient evidence or is contrary to law. *Id.* In determining whether an award is within the scope of the evidence, we may not reweigh the evidence or judge the credibility of witnesses. *Id.* However, the appropriate measure of damages in a breach of contract case is the loss actually suffered as a result of the breach. *Id.* The non-breaching party is not entitled to be placed in a better position than it would have been if the contract had not been broken. *Id.*

## B. *Analysis*

## 1. *Default*

Roche contends that the trial court erroneously determined that its actions constituted a default under Section 16.01. Specifically, Roche argues that it had a five-year lease with options to extend; its May 29, 2008 letter constituted notice sufficient to terminate the Sublease under Section 1.03; and that Marsh failed to institute the notice and cure provisions of Section 16.01. As a result, Roche contends that Section 1.03 applies, thereby allowing Roche to terminate the Sublease at five-year intervals provided that it gave twelve months' prior notice. By paying damages for five years, Roche argues that it would have cured any default. We disagree.

Section 1.03 provided the following:

> Provided that [Roche] shall not be in Default (as hereinafter defined) hereunder, [Roche shall have the right to terminate this [Sublease] as of December 31, 2013, December 31, 2018, or December 31, 2023 upon twelve (12) months prior written notice to [Marsh], which notice shall be accompanied by a payment to [Marsh] of a sum equal to three (3) months' [rent and other amounts.]

(Appellant's App. p. 91). Section 16.01 specified the events constituting default by Roche. Subsection (c) provides that "[f]ailure by [Roche] to observe or to perform any other covenant, agreement, condition or provision of this [Sublease]" constitutes an event of default. (Appellant's App. p. 115). The trial court concluded that Roche breached the Sublease by its improper termination on May 29, 2008. Pursuant to 16.01(c), this constituted an event of default triggering Marsh's remedies under Section 16.02.

We reject Roche's argument that it could terminate under Section 1.03. It assumes that Roche did not breach the Sublease and thereby commit an act of default under Section 16.01. Under the unambiguous language of Section 1.03, Roche could not avail itself of the early termination option if it committed an act of default. By refusing to enter into the Sublease after it received a compliant SNDA, Roche committed an act of default under Section 16.01(c) by breaching a covenant of the Sublease. Thus, Roche cannot avail itself of relief under Section 1.03.

Further, Roche fails to cite any authority permitting us to construe the Sublease as a five year lease with options to renew. As Marsh points out, the Sublease was negotiated by sophisticated parties and Roche could have insisted on a five-year lease with options to renew yet did not. Section 1.02(c) unambiguously provides that "[t]he

term of the [Sublease] for the entirety of the Premises shall expire on […] December 21, 2026, unless earlier terminated as provided in this [Sublease]." (Appellant's App. p. 91).

The Sublease unambiguously spells out the consequences of Roche's default. Section 16.02 (b) permitted Marsh to terminate Roche's right of possession (in other words, to affirm the Sublease) and relet the Premises. The parties agreed that Roche would be liable for unpaid rent remaining for the duration of the Sublease, but only to the extent that such rent exceeds rental amounts received by Marsh from reletting of the Premises. The trial court concluded that Marsh had properly mitigated its damages in reletting the Premises. Roche makes no argument that the trial court improperly calculated the amount of damages or that Marsh failed to mitigate its damages.

Finally, Roche cannot insist that Marsh failed to observe Section 16.01 notice and cure provision. Marsh's June 24, 2008 letter expressly urged Roche "to cure its default by retracting its repudiation of the Sublease." (Appellant's App. p. 597). A default termination clause in a contract enables a party to terminate its own performance and bring suit against the breaching party. *Solitron Devices, Inc. v. Honeywell, Inc.*, 842 F.2d 274, 278 (11th Cir. 1988). Where the contract has already been terminated by the party allegedly in breach, the suing party's compliance or lack of compliance with the termination clause is irrelevant. *Id.* Thus, we are not persuaded by Roche's argument that Marsh failed to follow Section 16.01(c): once Roche terminated the Sublease, a cure notice delivered twenty days thereafter would have served no purpose. In any event, Roche's June 12, 2008 letter unequivocally indicates that Roche had no intention to enter

34

into the Sublease. For all of these reasons, we find no abuse of discretion by the trial court's award of damages on these grounds.

## 2. *Speculative Damages – long-term lease*

Roche additionally argues that the damages awarded by the trial court are speculative because its calculation of damages was based on the full eighteen-year term of the Sublease. Roche cites *Rauch v. Circle Theatre*, 374 N.E.2d 546 (Ind. Ct. App. 1978), for the proposition that damages for breach of a long-term lease are inherently speculative and that the evidence only supported damages up to December 31, 2013.

*Rauch* involved the breach of an 89-year lease by the lessee based upon its unauthorized assignment of the lease. *Id*. at 549. The breach occurred approximately halfway through the lease. *See id*. The *Rauch* court cited the general rule that "the lessor's damages would be computed by reference to the rent reserved for the entire term of the lease." *Id*. at 552. However, it recognized that "where a lease is to run for a lengthy number of years into the future, an award of damages calculated by reference to the entire term of the lease would render a figure that would be so arbitrary and speculative as to be wholly inequitable." *Id*. Finding, however, that the lessor had not suffered an injury, the *Rauch* court refused to overturn the trial court's decision not to award damages for the lessee's breach. *Id*. at 553.

*Rauch* contains factors distinguishing it from this case. Most importantly, the opinion does not mention whether the lease included contractual damage provisions agreed to by the parties. Further, although concluding that the lessee committed an

anticipatory breach, the *Rauch* court actually found that this did not give rise to damage apart from nominal damages. *See id.* Consequently, the *Rauch* court's citation to the general rule on the propriety of damages for breach of long-term lease is arguably *dicta* and inapplicable under the circumstances here.

While we agree that damages for the breach of a long-term contract may be susceptible to speculation, they are not inherently speculative, especially under the particular circumstances of this case. The "landlord's damages for the tenant's breach of a long-term lease agreement is the difference between the present lease value for the remainder of the term and the present fair rental value of the premises for the remainder of the term." 25 WILLISTON ON CONTRACTS § 66:86 (4th ed. 2002). The term may not exceed, however, a period in which damages "can reasonably be forecasted or soundly predicted." 49 AM. JUR. 2D LANDLORD AND TENANT § 93 (2006).

Here, Roche and Marsh entered into an eighteen year sublease that spelled out Roche's rental obligation throughout the term. The trial court used a 6% discount rate to calculate the present value of these rental payments. It reduced such amount by what it concluded to be the fair rental value for the remainder of the term based upon Marsh's sublease with First Advantage, which Roche did not challenge during the trial or on appeal. Consequently, any speculation here results from the possibility that Roche would exercise its early termination option. While under ordinary circumstances that may suffice to conclude that damages are indeed speculative, that option was foreclosed by Roche's default. Roche's allegations of speculation under these circumstances are

36

therefore unfounded. Accordingly, we hold that the trial court did not abuse its discretion in awarding Marsh damages based on Roche's rental obligation under the eighteen-year term of the Sublease.

## CONCLUSION

Based on the foregoing, we conclude that (1) the trial court properly denied Roche's cross-motion for summary judgment; (2) that the trial court properly granted Judgment in favor of Marsh; and (3) that the trial court did not abuse its discretion in awarding Marsh damages.

Affirmed.

BAILEY, J. concurs

CRONE, J. dissents with separate opinion

**IN THE**
**COURT OF APPEALS OF INDIANA**

ROCHE DIAGNOSTICS OPERATIONS, INC.,)

      Appellant-Defendant,         )

             vs.            )      No. 29A02-1201-PL-4

MARSH SUPERMARKETS, LLC,      )

      Appellee-Plaintiff.         )

**CRONE, Judge, dissenting**

I respectfully dissent. I believe that the trial court should have granted Roche's summary judgment motion because the Sublease and Extension Letters are unambiguous and authorize Roche to terminate the Sublease at the time and in the manner that it did. I agree with Roche that its "right to terminate vested once Marsh failed to deliver the fully executed SNDA by April 25, 2008" and that, pursuant to the Extension Letters, it could

still exercise that right at any point "on or before" the revised deadlines of May 15 and May 30, 2008, respectively; "[t]he only change was that Marsh could cure its prior failure if it delivered the executed SNDA prior to termination." Appellant's Br. at 21. This is the only interpretation of the Extension Letters that does not nullify Roche's bargained-for right to terminate the Sublease after April 25 and does not render the phrase "on or before" meaningless. Roche's termination of the Sublease became effective before Marsh delivered the SNDA; therefore, Roche was not in default and its damages should be limited to December 31, 2013, pursuant to Section 1.03 of the Sublease.