

**FILED**

Dec 30 2020, 9:05 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Michael L. Einterz, Jr.
Michael L. Einterz
Einterz & Einterz
Zionsville, Indiana

ATTORNEYS FOR APPELLEE

Mark J. R. Merkle
William J. Barkimer
Krieg DeVault LLP
Carmel, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Maples Health Care, Inc.,<br>*Appellant-Plaintiff,*<br><br>v.<br><br>Firestone Building Products,<br>*Appellee-Defendant.* | December 30, 2020<br><br>Court of Appeals Case No.<br>20A-PL-1095<br><br>Appeal from the<br>Hamilton Superior Court<br><br>The Honorable<br>William J. Hughes, Judge<br><br>Trial Court Cause No.<br>29D03-1603-PL-2240 |

**Kirsch, Judge.**

[1]    Following the 2001 installation of its roof, Maples Health Care, Inc. ("Maples") had two warranties issued to it by Firestone Building Products ("Firestone"), the Red Shield Roofing System Limited Warranty ("Red Shield Warranty") and Roofing Membrane Limited Warranty ("Membrane Warranty"). After a bench trial covering both liability for breach of warranty and damages, the trial

court entered a judgment in favor of Maples, finding Firestone liable for breach of warranty and awarding Maples damages in the amount of $9,500.00. Following the trial court's denial of Maples's request for clarification and motion to correct error, Maples raises the following issues for our review:

> I. Whether the judgment finding Firestone liable for breach was as to both warranties; and

> II. Whether the damage award was supported by the evidence.

We affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

Maples owns an approximately one-hundred-year-old, five-story facility in Bluefield, West Virginia, which it operates as a nursing home, long-term care, and assisted living facility. *Appellant's App. Vol. 2* at 24; *Tr. Vol. 2* at 19, 126. Maples purchased a Firestone-brand roof, which was installed by MetalTec Roofing, Inc. in March 2001. *Appellant's App. Vol. 2* at 24; *Ex. Vol. 3* at 5-9. On March 10, 2001, Firestone issued two warranties for the roof installation: a fifteen-year Red Shield Warranty and a twenty-year Membrane Warranty. *Ex. Vol. 3* at 11-14.

The Red Shield Warranty covers the Firestone Roofing System and provides that it is limited to "the Firestone brand membranes, Firestone brand insulations, and other Firestone brand accessories when installed in accordance with Firestone technical specifications." *Id.* at 14. Under the Red Shield

Warranty, Firestone agreed to repair leaks, specifying that Maples's "sole and exclusive remedy and Firestone's liability shall be limited to the repair of the leak." *Id.* The Red Shield Warranty also included a provision regarding the parties' obligations specifying that, if Firestone determined that the cause of the leak is "outside the scope of [the Red Shield Warranty]," Firestone was required to "advise" Maples of "the type and/or extent of repairs required to be made at [Maples's] expense" to prevent the Red Shield Warranty from lapsing. *Id.*

[5] The Red Shield Warranty excluded damage occurring from, among other sources, "[d]eterioration or failure of building components, including, but not limited to, the roof substrate, walls, mortar, HVAC units, etc." and for "[c]ondensation or infiltration of moisture in, through, or around the walls, copings, rooftop-hardware or equipment, building structure or underlying or surrounding materials" from warranty coverage. *Id.* The Red Shield Warranty also provided that neither Firestone nor Maples could "commence or prosecute any suit, proceeding, or claim [regarding the Red Shield Warranty] other than in courts of Hamilton County in the State of Indiana or the United States District Court, Southern District of Indiana, Indianapolis Division." *Id.* The Red Shield Warranty also contained the following language: "THIS LIMITED WARRANTY SHALL BE THE OWNER'S SOLE AND EXCLUSIVE REMEDY AGAINST FIRESTONE AND FIRESTONE SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL, SPECIAL, INCIDENTAL OR OTHER DAMAGES INCLUDING, BUT NOT LIMITED TO, LOSS OF

PROFITS OR DAMAGE TO THE BUILDING OR ITS CONTENTS OR THE ROOF DECK." *Id.*

[6] The Membrane Warranty, which covers the Firestone Roofing Membrane, provides that it is limited to "the Firestone brand Membrane when installed in accordance with Firestone Technical Specifications" and is a separate warranty for leaks occurring through the Membrane as a result of weathering. *Id.* at 11. The Membrane Warranty provides that Maples's "sole and exclusive remedy and Firestone's liability shall be limited to the supply of replacement membrane material sufficient to replace the affected area of membrane" as the remedy. *Id.* The Membrane Warranty also contains provisions requiring Firestone to notify Maples if the cause of a leak through the membrane is outside the scope of the warranty, excluding damages from certain sources, and language disclaiming Firestone's liability for consequential, special, incidental, or other damages. *Id.* Unlike the Red Shield Warranty, the Membrane Warranty does not include a provision allowing for a lawsuit; instead, it provides that a dispute "shall be settled by final and binding arbitration in accordance with the American Arbitration Association's rules for the construction industry." *Id.*

[7] Maples first notified Firestone of a leak on June 29, 2006, and Firestone began a leak tracer report to track the repair. *Appellant's App. Vol. 2* at 24; *Ex. Vol. 3* at 122-30. Firestone Division Manager for Technical Services Ken Crocker ("Crocker") explained that a leak tracer report is a "tracking mechanism for any activity on the project" that catalogues leak reports and includes the purchase orders that Firestone receives from the responding contractor. *Tr. Vol. 2* at 134-

35.  From June 29, 2006 through December 8, 2015, Firestone issued a total of twenty-two purchase orders for the investigation and repair of leaks that Maples had reported pursuant to the Red Shield Warranty, and the leak tracer reports and purchase orders were not provided to Maples until litigation was instituted. *Ex. Vol. 3* at 16; *Tr. Vol. 2* at 21, 162.  Crocker stated that the leak tracer reports are subject to a "not to exceed" amount, which is a cost-control mechanism but that "it's a no-dollar limit warranty," and "in some cases" Firestone had "spent two or three times what the original roof cost," but the not-to-exceed amount "is placed on the contractor to go out with no further communication to us and effect a repair." *Id.* at 135.

[8]   An invoice from Dunford Roofing, the contractor Firestone sent to respond to the leak, that accompanied a May 4, 2009 leak repair contained a note about the repair, which stated, "[l]ocated opening at scupper flashing due to severe bridging." *Ex. Vol. 3* at 144.  Crocker indicated that bridging is tied to the freeze/thaw cycle which puts "stress on that membrane" and over time "the membrane may or may not hold." *Tr. Vol. 2* at 142.  Leaks continued to occur, but James Montgomery ("Montgomery"), a project and facility manger for Maples, explained that in October 2014 Maples began renovation work on its fifth floor for use as rooms for residents. *Tr. Vol. 2* at 41-42; *Appellant's App. Vol. 2* at 24.  During the renovation, Maples's contractor, Rick Blizzard ("Blizzard"), discovered areas of the ceiling, insulation, and walls in the fifth, fourth, and third floors of the building that were water-damaged, and he

contacted Firestone on November 14, 2014, requesting an investigation of the roof. *Tr. Vol. 2* at 43-44; *Ex. Vol. 3* at 32-38.

[9] In a November 24, 2014 email to Blizzard, Firestone representative for Quality and Building Services Tom Julian ("Julian") explained that up to that point there had been no previous investigation of the roof, but he suspected that "the exterior masonry walls are a plausible and likely cause of the water penetration into the building." *Ex. Vol. 3* at 41. He noted that "the photos of the leak locations all appear to be near to [a] wall," which is "consistent with water penetration through the wall." *Id.* Julian wrote that there were "substantial repairs to the bridged flashing, but the bridged flashing was likely not leaking" because the "repairs would have eliminated any leak source in the system along these wall areas." *Id.* at 42. He recommended to Blizzard an evaluation of "the exterior masonry wall as a source or contributor to the water penetration at the building." *Id.*

[10] Firestone assigned Mark Christian ("Christian") to perform the investigation in January 2015. *Ex. Vol. 3* at 106; *Appellant's App. Vol. 2* at 26. A January 8, 2015 email forwarded to Christian regarding the Maples investigation showed that Julian wanted to "keep all correspondence (including this email) confidential to Firestone personnel, don't share it w/ the building owner, consultant, roofing contractor or sales rep." *Ex. Vol. 3* at 111. In a January 15, 2015 email to Dunford Roofing and Julian, Christian reported the results of his investigation, writing that, "[a]long the south east wall of the penthouse I found that the bridging EPDM has pulled the termination bar away from the masonry wall of

the penthouse" and that "about 22 feet of wall flashing that needs to be repaired." *Id.* at 106. He added that, if it could be repaired for "$2000.00 or less, (less being great for us)," Julian could approve the repair immediately, but if it would cost more than $2,000.00, a repair proposal would be necessary. *Id.* The investigation results were not shared with Maples. *Tr. Vol. 2* at 61.

[11] Dunford Roofing performed the repair identified in the investigation on January 26, 2015 for $1,972.72. *Ex. Vol. 4* at 21; *Appellant's App. Vol. 2* at 26. Following the repair, Maples continued with the fifth-floor renovation project, completing the work in early March 2015 but incurring additional costs to address the water damage and construction delays. *Tr. Vol. 2* at 63-65, 72-73. After the renovation was complete, another leak was reported on March 26, 2015 and was repaired at a cost of $990.04. *Ex. Vol. 4* at 24-30. Maples reported another leak on November 4, 2015 that was repaired by Dunford Roofing. *Ex. Vol. 4* at 32-36. Maples approached Dunford Roofing to determine what needed to be done to address the leaks. *Tr. Vol. 2* at 66-67. Dunford Roofing provided Maples with a roof repair estimate dated November 11, 2015, at a cost of $9,500.00, which included the removal of "280 [linear feet] of old bridged out EPDM wall flashing" along with installation of "new base tie in detail at wall perimeters" and to "[s]plice new EPDM roof membrane into existing roof . . . ." *Ex. Vol. 3* at 116. Montgomery stated that Maples did not pursue this work because it "thought that the issues on the roof should have been covered by Firestone because of our ongoing problems with the roof." *Tr. Vol. 2* at 67.

[12]     Maples reported another leak on December 7, 2015, which was repaired by Dunford Roofing. *Ex. Vol. 4* at 38-45. After this leak notification, Ronald Scherer ("Scherer"), Maples's Chairman, sent Julian a letter on January 12, 2016 regarding the leaks that had occurred since 2006.[1] *Tr. Vol. 2* at 122-23; *Ex. Vol. 3* at 119-21. Scherer wrote that the issues Maples had experienced were a result of "improper installation" by "[Firestone's] authorized installer [MetalTec Roofing, Inc.]." *Id.* at 120. Scherer added that the roof's issues resulted in a "substantial loss of revenue," and in the renovation of its fifth-floor rooms, Maples had to spend additional money to repair water-damaged areas because of the roof. *Id.* at 121. Noting that, with "only months left under warranty," Scherer requested that "Firestone take steps to properly install a new replacement roof system to correct the failures we have experienced to date." *Id.* Scherer acknowledged that "one of the two warranties either called for mediation or arbitration," but Firestone did not respond to his letter. *Tr. Vol. 2* at 124.

[13]     As to the leak repairs that had occurred at Maples's facility, Crocker explained that, although he had never visited the facility, "every time we did a leak, we may have been repairing one here, but we're disturbing the membrane here and

---

[1] Scherer's letter begins, "[w]e have discovered yet another new failure in the roofing system. This is the 19th or 20th warranty claim since 2006 resulting in more than 25 individual repair areas," and it is not clear whether this was reporting a new leak or if it was a reference to the December 7, 2015 leak that had been repaired. *Ex. Vol. 3* at 120; *Ex. Vol. 4* at 38-45. Scherer's letter does not appear to have specifically requested either mediation or arbitration. *Ex. Vol. 3* at 119-21.

here on both sides of where we were working," which resulted in the leaks "[w]alking down the wall" over time. *Id.* at 148.

[14] On March 9, 2016, one day before the expiration of the Red Shield Warranty, Maples filed a complaint alleging that Firestone failed to repair the leaks over the period of 2006 through 2016 and refused "to perform necessary repairs in 2015 and 2016" and seeking damages for the breach. *Appellant's App. Vol. 2* at 4. Maples's complaint principally referred to the Red Shield Warranty but also mentioned the Membrane Warranty, and it attached a copy of the Red Shield Warranty but did not attach a copy of the Membrane Warranty. *Id.* Firestone filed its answer on May 12, 2016, in which it denied that Maples was entitled to the recovery of damages for the alleged breach of warranty and asserted affirmative defenses. *Id.* at 6-11. The parties filed motions for summary judgment, which were denied, and the case proceeded to a bench trial. *Appellant's App. Vol. 2* at 63, 120.

[15] The bench trial began on February 24, 2020 and addressed both liability and damages. *Tr. Vol. 2* at 2. As to damages, Montgomery testified that Maples suffered monetary damages in the amount of $308,600.00, and he provided a breakdown of the costs involved in that proposed award. *Id.* at 70-75. Regarding the value of the fifth-floor construction and renovation work, Montgomery stated that the amount was "roughly around $100,000[.00]," which included "drywall replacement . . . tearing out the walls and ceilings, replacing insulation[,]" rewiring damaged electrical outlets, and replacing "rusted out" ceiling struts. *Id.* at 72. The value of employing Blizzard for the

additional time and labor was "about an additional $25,000[.00] . . . for the additional two months." *Id.* at 72-73. Montgomery stated that the value of the loss of use of thirteen rooms on the fifth floor for two months was $54,600.00. *Id.* at 73.

[16] Montgomery added that Maples incurred additional labor and maintenance costs of $10,000.00 because its maintenance personnel "were involved, obviously almost continuously on the roof." *Id.* at 73. He stated that, each time it rains, "we have to go around and reinspect all the rooms" to avoid "a citation from the State of West Virginia" on account of possible health issues and not "lose those patients, or even potentially lose our license . . . we literally have to go into every room, reinspect everything. We reinspect the roof every time it rains or snows, and we'll have to continue doing that until this problem is solved." *Id.* Montgomery based the $10,000.00 figure on an estimate of the employees' "[n]umber of hours times their hourly rate plus incentive, plus their benefit" as part of the additional labor and maintenance costs. *Id.* at 74. Montgomery also proposed a figure of $50,000.00 for the value of "additional employee time," which included his own time and that of "the owner, his wife, the nursing home, nursing director, housekeeping . . . to go in there . . . to reclean all those rooms and everything and the LPN." *Id.* He also testified that the quote for Maples to get a new roof was $69,000.00, which was included in the proposed damage award. *Id.* at 75. He also added that the damages could be much more than that because Maples did not yet know the "damage to the roof deck itself cause until we remove that membrane, we don't even know

what's under there due the extensive damage from water constantly going through our roof deck itself." *Id.* Maples did not submit any documentation, invoices, or estimates or otherwise provide any additional evidence as to its damages. *Id.* at 70-75.

[17] On cross-examination, Montgomery acknowledged having received the $9,500.00 repair estimate from Dunford Roofing. *Id.* at 76. In response to whether its claims "relating to lost use of the premises on the fifth floor would have been alleviated" if Maples had done the repairs identified in the $9,500.00 repair estimate from Dunford Roofing, Montgomery stated "[t]hat's what they were presenting. I do not know that." *Id.* at 76. Firestone also elicited testimony from Montgomery that no expert had ever determined that the membrane was defective and that no masonry repairs such as tuckpointing or caulking around windows had occurred. *Id.* at 78-80. In response to a question about whether the damages that Montgomery had proposed in his direct testimony were excluded under the language in the Red Shield Warranty, which disclaimed Firestone's liability for "any consequential, special, or incidental or other damages, including, but not limited to loss of profits or damage to the building or its contents or the roof deck," Montgomery responded "[o]kay. I, again, that's a legal area. I'm not a lawyer, so I, I couldn't tell you." *Id.* at 80-81.

[18] In closing, as to damages, counsel for Maples stated that Firestone had an "obligation under the warranty to fully repair this leak when they first found it" but that they did not do it and it caused Maples "[$308,600.00] in damages and

therefore that award of damages to Maples is proper here." *Id.* at 157. Firestone's counsel argued that "as a matter of mitigation of damages, [Maples] had known back in November of '14 [sic] that Dunford Roofing would have allegedly completed the total repair for [$9,500.00]. So, at that point in time, [Maples] could have gone forward and made the repairs and mitigated the damages." *Id.* at 167-68. Firestone's counsel engaged in the following exchange with the trial court over the matter of the warranty's exclusions for lost profits and damages to the building:

> THE COURT: Doesn't that only apply if you comply with the warranty and breach of warranty includes consequential damages, even if it's a breach of a specific warranty[?]
>
> . . . .
>
> MR. MERKLE: Actually the law is, is, is quite explicit that you can have both . . . that just because, even if you were to fail to make the repair warranty, that does not exclude or, or invalidate the ah, claims for the ah, inconsequential, the disclaimer of inconsequential and [sic] incidental damage. That's the Rheem versus Phelps Heating case, 746 N.E.2d 941 by our Supreme Court on May 9, 2001.[2]

---

[2] *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 746 N.E.2d 941, 948 (Ind. 2001) (explaining that with respect to an exclusion of incidental and consequential damages in a limited warranty that even where a remedy in a limited warranty fails of its essential purpose that such an exclusion is valid unless the exclusion is unconscionable).

THE COURT: Okay.

MR. MERKLE: So, what we have here . . . Your Honor, is that . . . there's no determination [the] disclaimers of the damages that are at the bottom of the warranty should not be enforced and so, if ah, if the Court were to even determine that there was a breach of the repair under the warranty, the disclaimers is still valid and would be ah, ah, and would keep out any of these claims over and above the $9500[.00] which is what has been the evidence shows as the cost of the repair.

*Id.* at 168-69. In reply, as to the disclaimer of consequential damages and *Rheem*, Maples's counsel was "not familiar with the Rheem case" but contended that Firestone was arguing "if we don't do what we're supposed to and fix the leak, you can't do anything except ask us to fix it later. Well, the problem is if you don't fix a leak, you get water damage." *Id.* at 171. Maples further contended that it should be awarded the full $308,600.00 in damages because Firestone did not "appropriately respond" to the report of the roof's bridging in 2009 that it "can't now come back and claim defense of the contract when they are the ones in breach," and that Maples "incurred a whole slew of damages solely because of [Firestone's] breach." *Id.*

[19] After the bench trial, the trial court issued a judgment "in favor of [Maples] and against [Firestone] on [Maples's] complaint for breach of warranty" and that Maples had "proved damages in the sum of $9,500[.00] as a result of [Firestone's] breach of warranty." *Appellant's App. Vol. 2* at 146-47. Maples then filed a request for clarification and motion to correct errors, seeking to clarify whether the trial court's order finding Firestone in breach extended to

both the Red Shield Warranty and the Membrane Warranty and the proper measure of damages for the breach. *Id.* at 148-57. Firestone responded, arguing that Firestone was in breach only as to the Red Shield Warranty, which it maintained was the sole warranty claim Maples alleged in its complaint, and that the trial court correctly determined Maples's damages. *Id.* at 159-65.

[20] On May 5, 2020, the trial court held a hearing on Maples's request for clarification and motion to correct error and heard argument from the parties. *Tr. Vol. 2* at 173. At that hearing, Maples's counsel first argued that clarification as to which warranty was breached was necessary because it believed it had argued at trial that the Membrane Warranty had also been breached but that it was "not sure if the [Membrane Warranty]" was included in the judgment. *Id.* at 176. As to damages stemming from the breach, Maples maintained that "[t]he question is not ah, whether or not the warranty failed in its essential purpose for whether or not the warranty was unconscionable" but that Firestone did not comply with its obligations to repair the leaks and that when there is a "breach of contract, the appropriate measure of damages are those that are reasonably foreseeable consequences of not performing your obligations under the contract." *Id.* at 177. Maples argued that Firestone's failure to fix the bridging, the underlying problem, caused water damage and delays in construction resulting in damages of $308,600.00 from Firestone's failure to fix those leaks. *Id.* at 178. It contended that the award of $9,500.00 was not supported by the evidence, that the water damage was not disputed, and that it should have been awarded the full $308,600.00. *Id.*

Firestone argued that the only competent evidence to support the measure of damages was the $9,500.00 estimate from Dunford Roofing to repair the roof and that the Red Shield Warranty provides "for the repairs of leaks, not the repair of other items, so until the bridging actually exhibited a leak, ah there would not be a necessity to actually complete a repair," and the trial court's damage award reflects this consideration in its use of the $9,500.00 repair estimate. *Id*. at 178-79. It also argued that *Rheem* provided a guide to the trial court's award of damages because the parties' dispute, like the dispute in *Rheem*, involved "a [sale] of goods between merchants," keeping it within the ambit of the sales provisions of the Indiana Uniform Commercial Code ("UCC"). *Id.* at 179. It further argued that, under *Rheem*, when a limited warranty of repair fails, that a disclaimer of consequential or incidental damages is not invalidated unless the disclaimer is unconscionable and that unconscionability was not raised by Maples. *Id.* at 179-80. Firestone noted that there was a breach but that the "remedy is the damages resulting from that exact breach of the repair," which was the $9,500.00 that the trial court awarded. *Id.* at 181. Finally, Firestone's counsel stated that *Rheem* "stands on all fours with our case" because "there was no failure in essential purpose of the limited remedy and also even if there had been, it would not disclaim, it would not result in the, the other [consequential] damages being allowed to be recovered by [Maples.]" *Id.*

[22] Counsel for Maples disagreed with the applicability of *Rheem* and the UCC to the dispute over damages, countering that "our claim is that Firestone breached

its obligations under the warranty, therefore the UCC is not applicable here." *Id.* at 183. Counsel maintained that, because the trial court determined Firestone "failed to carry" its "obligations under the warranty . . . the consequential damages here include all of the water damages, all of the lost employee time, all of the delays" and should be reflected in the damage award. *Id.*

[23] At the conclusion of the hearing, the trial court orally denied Maples's request for clarification and motion to correct errors. *Id.* at 183-84. The trial court entered a written order on its oral denial of the request for clarification and motion to correct errors, stating that its judgment finding breach was "as to all claims made by [Maples] in its complaint" and that the damages entered were "the maximum damages supported by competent evidence." *Id.* at 166-67. Maples now appeals.

## Discussion and Decision

[24] Maples appeals following the denial of its request for clarification and motion to correct error, seeking to clarify whether the finding of breach was as to both the Red Shield Warranty and the Membrane Warranty and arguing that the damage award was not supported by the evidence.[3] We review a trial court's denial of a motion to correct error for an abuse of discretion. *Allstate Ins. Co. v.*

---

[3] To the extent Firestone contends that Indiana Trial Rule 52(A) represents the standard of review in this case, we note that while this is an appeal from a bench trial the trial court made no findings and conclusions.

*Hammond*, 759 N.E.2d 1162, 1165 (Ind. Ct. App. 2001). We reverse only when "the trial court's decision was against the logic and effect of the facts and circumstances before it, together with the inferences that can be drawn therefrom." *Hockema v. J.S., 832 N.E.2d 537, 541 (Ind. Ct. App. 2005), trans. denied.*

## I. Did the Judgment Cover Breach of Both Warranties?

[25] Maples maintains that the judgment of breach extends to both the Red Shield Warranty and the Membrane Warranty. It argues that the trial court's statement in its order on Maples's request for clarification and motion to correct error, which stated that the judgment was "as to all claims made by [Maples] in its complaint," amounts to a conclusion by the trial court that it was entitled to the relief it sought in the complaint, specifically for water damages and the cost of repairs to its facility due to breach of both warranties. *Appellant's Br.* at 12 (quoting *Appellant's App. Vol. 2* at 166-67).

[26] We disagree that Maples made a separate claim under the Membrane Warranty in its complaint. First, the Membrane Warranty expressly provided that "any dispute, controversy, or claim" between Maples and Firestone concerning the Membrane Warranty "shall be settled by final and binding arbitration in accordance with the American Arbitration Association's rules for the construction industry." *Ex. Vol. 3* at 11. The dispute resolution provision of the Membrane Warranty called for arbitration and did not authorize the filing of a

lawsuit in the event of a dispute, controversy, or claim between the parties. Second, paragraph 4 of Maples's complaint alleged as follows:

> Firestone granted Maples a 15-year Roofing System Limited Warranty and a 20-year Roofing Membrane Warranty. A copy of the Roofing System Limited Warranty ("Warranty") is attached as exhibit A. By the terms of the Warranty, the 15[-]year period began March 10, 2001 and had not yet expired on the date this Complaint was filed. As required by the Warranty, Maples has requested that Firestone mediate this dispute.

*Appellant's App. Vol. 2* at 2. It is clear that the complaint mentioned the existence of the Membrane Warranty, but it did not otherwise specifically raise a claim under the Membrane Warranty and did not attach a copy of the Membrane Warranty. *See* Ind. Trial Rule 9.2(A) ("When any pleading allowed by these rules is founded on a written instrument, the original, or a copy thereof, shall be included in or filed with the pleading."). In the complaint, Maples used the defined term "Warranty" in reference to the 15-year Roofing System Limited Warranty, attached that warranty to the complaint, and referred throughout the complaint to the "Warranty" which, as noted, referred only to the 15-year Roofing System Limited Warranty. *Id.* at 2-4. In particular, Maples's complaint alleged that it had requested Firestone "pursuant to the *Warranty*, complete the full repairs, but Firestone failed and refused to perform any additional repairs." *Id.* at 3 (emphasis added). Similarly, in paragraph 12 of the complaint, Maples contended that "Firestone's insufficient repairs from 2006 until 2016 constitute a breach of the *Warranty* with Maples" entitling it to "damages incurred as a consequence of the breach, including water damage

suffered to its property." *Id.* (emphasis added). Similarly, paragraph 13, the complaint's other request for relief, stated that "Firestone's failure and refusal to perform necessary repairs in 2015 and 2016 constitutes [an] additional Breach of the *Warranty* with Maples," entitling it to "recover damages incurred as a consequence of breach, including the cost to perform the necessary repairs by a contractor of Maples'[s] choice." *Id.* at 4 (emphasis added). Thus, the complaint is best read as encompassing only the Red Shield Warranty, and, as noted, the proper venue for a dispute under the Membrane Warranty was an arbitral panel and not the trial court. *Ex. Vol. 3* at 11. Therefore, the trial court's judgment finding Firestone liable for breach extends only to the Red Shield Warranty as it was the sole claim alleged in the complaint that was properly before the trial court, and we affirm that judgment only as to breach of the Red Shield Warranty.[4]

## II.    Was the Damage Award Supported by the Evidence?

We next address whether the damage award was supported by the evidence. Maples argues that the damage award is unsupported by the evidence because it does not take into account Montgomery's testimony, which estimated Maples's damages at $308,600.00. The computation of damages for a breach of contract is a matter within the sound discretion of the trial court. *City of Jeffersonville v. Env't Mgmt. Corp.*, 954 N.E.2d 1000, 1015 (Ind. Ct. App. 2011). We will not

---

[4] On remand, we order the trial court to refer any dispute, claim, or controversy arising under the Membrane Warranty to arbitration.

reverse a damage award upon appeal unless it is based on insufficient evidence or is contrary to law. *Id.* In determining whether an award is within the scope of the evidence, we may not reweigh the evidence or judge the credibility of witnesses. *Id.* A factfinder may not award damages on the mere basis of conjecture and speculation. *Sheek v. Mark A. Morin Logging, Inc.*, 993 N.E.2d 280, 287 (Ind. Ct. App. 2013) (citing *Indianapolis City Mkt. Corp. v. MAV, Inc.*, 915 N.E.2d 1013, 1024 (Ind. Ct. App. 2009)), *trans. denied.* Instead, the award must be supported by probative evidence. *Id.* (citing *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 507 (Ind. Ct. App. 2007)). "Accordingly, a damage award must reference some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss of profits, or direct inference from known circumstances." *Farah, LLC v. Architura Corp.*, 952 N.E.2d 328, 337 (Ind. Ct. App. 2011) (quoting *Coffman v. Olson & Co., P.C.*, 906 N.E.2d 201, 210 (Ind. Ct. App. 2009), *trans. denied.*). In a breach of contract action, the measure of damages is the loss actually suffered by the breach. *Sisters of St. Francis Health Servs., Inc. v. EON Props., LLC,* 968 N.E.2d 305, 313 (Ind. Ct. App. 2012). That said, the non-breaching party is not entitled to be placed in a better position than it would have been if the contract had not been broken. *Id.*

[28] Here, without any explanation, the trial court's order awarded damages to Maples in the amount of $9,500.00. *Appellant's App. Vol. 2* at 146. Similarly, in denying Maples's request for clarification and motion to correct error, the trial court's order again stated, without further explanation, that the amount of

damages was "the maximum damages supported by competent evidence." *Id.* at 167. Neither the trial court's damage order, nor its denial of Maples's request for clarification and motion to correct error, expressly state what the damage award was based upon or the method used to determine that $9,500.00 was an appropriate measure of Maples's damages and neither contains any findings or conclusions. *Id.* at 146, 166-67.

[29] Maples bases its proposed damage award principally on the testimony of Montgomery, who explained that the $308,600.00 covered Maples's costs for construction and renovation, including additional contractor time, additional labor and maintenance expenses to monitor the roof, additional employee time to monitor the rooms, and the cost of a replacement roof, and contending that Montgomery's figures were not questioned or refuted on cross-examination, that his testimony was not based on speculation, and that Firestone did not propose any alternative figures. *Appellant's Br.* at 14-17. Maples asserts that the damage award is an "all-or-nothing proposal: either Firestone is not liable, or, if Firestone is liable, they are responsible for the 'loss actually suffered' by Maples -- the $9,500[.00] figure does not correspond to any evidence regarding the losses suffered by Maples." *Id.* at 18.

[30] Here, the $9,500.00 repair quote from Dunford Roofing appears to have been the trial court's evidentiary basis for the damage award. *Ex. Vol. 3* at 116. The trial court was not required to accept Maples's much higher figure as the amount of its damages, *see Farah*, 952 N.E.2d at 339-40, but it is unclear whether the trial court concluded that the $9,500.00 in fact reflected the cost of

repair as the measure of Maples's damages, as it stated only that Maples "proved damages of $9,500[.00]" and in the order on Maples's request for clarification and motion to correct error that the damage award reflected "the maximum damages supported by competent evidence." *Appellant's App. Vol. 2* at 146, 166-67; *Tr. Vol. 2* at 67, 78; *Ex. Vol. 3* at 116. We agree with Maples that the record also shows a history of spot-repairs to address recurrent leaks that had the effect of "[w]alking [the leaks] down the wall" over time. *Tr. Vol. 2* at 148. Maples raises a number of other arguments that are connected with the trial court's basis for its damage award. Specifically, that the duty to mitigate its damages[5] does not support the trial court's $9,500.00 award and that neither the UCC's sales provisions[6] nor the holding of *Rheem* regarding the validity of limitations on incidental or consequential damages[7] in a limited warranty under

---

[5] Generally, the non-breaching party to a contract has a duty to mitigate damages that stem from the breach. *Fischer v. Heymann*, 12 N.E.3d 867, 871 (Ind. 2014) (citations omitted). Regarding mitigation, we note that a discussion about the possibility of water infiltration into the facility through the exterior masonry walls occurred with Blizzard, but there is no indication that Maples was directly informed of the possible masonry issues. *Tr. Vol. 2* at 61, 102; *Ex. Vol. 3* at 41-42. Likewise, the roof investigation and leak tracer reports were also not provided to Maples until litigation ensued, and it is unclear whether any of the recommendations in those reports were stated verbally to Maples personnel. *Tr. Vol. 2* at 61, 162; *Ex. Vol. 3* at 111.

[6] We note that the UCC provides "[u]nless the context requires otherwise, IC 26-1-2 applies to transactions in goods." Ind. Code § 26-1-2-102. It defines "goods", in pertinent part, as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale, other than the money in which the price is to be paid, investment securities (IC 26-1-8.1), and things in action." Ind. Code § 26-1-2-105. The Indiana Supreme Court has noted that "[m]any modern commercial transactions cannot be classified as transactions purely for goods or for services, but are 'mixed,' involving both goods and services." *Insul-Mark Midwest, Inc. v. Mod. Materials, Inc.*, 612 N.E.2d 550, 553-54 (Ind. 1993). In such situations, courts typically require the application of the predominant thrust analysis to determine whether the UCC is applicable to a transaction. *Id.* at 556. The record shows that MetalTec Roofing, Inc. installed the roof in March 2001, and that Firestone sold the two warranties to Maples. *Ex. Vol. 3* at 5-9.

[7] Generally, consequential damages may be awarded for breach when the non-breaching party's loss flows naturally and probably from the breach and was contemplated by the parties when the contract was made. *Johnson v. Scandia Assocs., Inc.*, 717 N.E.2d 24, 31 (Ind. 1999). The UCC also allows for the recovery of incidental or consequential damages upon breach and for limitations on remedies and damages. *See* Ind.

Indiana Code section 26-1-2-719(3) apply to the present dispute. Although the parties argued below about these topics, the trial court's orders regarding damages were silent as to whether it concluded the parties' dispute was subject to the UCC's sales provisions or governed by the common law of contracts, whether the $308,600.00 in damages that Maples sought were incidental or consequential damages unavailable to it pursuant to *Rheem*, or whether Maples failed to mitigate its damages. To the extent the trial court's damage award is based on the $9,500.00 repair invoice, it is within the evidence presented, but we cannot say that the $9,500.00 award is based on probative evidence in light of the record of spot-repairs as to the measure of Maples's damages. *See Whitaker v. Brunner*, 814 N.E.2d 288, 296 (Ind. Ct. App. 2004) ("The damage award cannot be based on speculation, conjecture, or surmise, and must be supported by *probative* evidence.") (emphasis added), *trans. denied.* We, therefore, reverse the damage award and the order on the request for clarification and motion to correct error as to damages. We remand with instructions to hold another hearing on damages that addresses: (1) the appropriate measure of damages, including (if necessary) the use of a third-party expert to review the pleadings and evidence and render an opinion on the calculation of damages; (2) whether Maples failed to mitigate its damages; and

Code § 26-1-2-715 (providing for the recovery incidental and consequential damages on breach); Ind. Code § 26-1-2-316(4) ("Remedies for breach of warranty can be limited in accordance with the provisions of IC 26-1-2-718 and IC 26-1-2-719 on liquidation or limitation of damages and on contractual modification of remedy.") In addition, "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." Ind. Code § 26-1-2-719(3); *see also Rheem*, 746 N.E.2d at 948.

(3) whether the UCC applies and if *Rheem* limits Maples's proposed damage award; with an order containing findings and conclusions that explain the damage award.

[31] Affirmed in part, reversed in part, and remanded with instructions.

Pyle, J. concurs.

Tavitas, J., concurs in part and dissents in part with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Maples Health Care, Inc.,<br>*Appellant-Plaintiff,*<br><br>v.<br><br>Firestone Building Products,<br>*Appellee-Defendant*. | Court of Appeals Case No.<br>20A-PL-1095 |

**Tavitas, Judge, concurs in part and dissents in part.**

[32] I respectfully concur in part and dissent in part. I agree with the majority's determination affirming the trial court as to breach of the Red Shield Warranty. I dissent, however, regarding the majority's reversal of the damage award. I conclude that the trial court's damage award is supported by the evidence, and I would affirm.

[33] The majority notes that the trial court awarded $9,500.00 in damages to Maples without any explanation. The parties, however, did not request findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52, and the trial court did not issue findings of fact and conclusions thereon. "In the absence of special findings, we review a trial court decision as a general judgment and,

without reweighing evidence or considering witness credibility, affirm if sustainable upon any theory consistent with the evidence." *Baxendale v. Raich*, 878 N.E.2d 1252, 1257 (Ind. 2008). "In reviewing a general judgment, we must presume that the trial court correctly followed the law." *Perdue Farms, Inc. v. Pryor*, 683 N.E.2d 239, 240 (Ind. 1997).

[34] The computation of damages is a matter within the discretion of the trial court. *Ponziano Const. Servs. Inc. v. Quadri Enterprises, LLC*, 980 N.E.2d 867, 873 (Ind. Ct. App. 2012). Mathematical certainty is not required, but the amount awarded must be supported by evidence in the record and may not be based on mere conjecture, speculation, or guesswork. *Id.* "When the specific issue on review relates to a question of inadequate or excessive damages, we will not reverse a damage award if it is within the scope of the evidence before the trial court . . . ." *Id.*

[35] Here, the Red Shield Warranty provided that Maples's "sole and exclusive remedy and Firestone's liability shall be *limited to the repair of the leak*." Ex. Vol. III p. 13 (emphasis added). The Red Shield Warranty excluded damage occurring from "[d]eterioration or failure of building components, including, but not limited to, the roof substrate, walls, mortar, HVAC units, etc." and for "[c]ondensation or infiltration of moisture in, through, or around the walls, copings, rooftop-hardware or equipment, building structure or underlying or surrounding materials" from warranty coverage. *Id.* The Red Shield Warranty also provided: "THIS LIMITED WARRANTY SHALL BE THE OWNER'S SOLE AND EXCLUSIVE  REMEDY AGAINST FIRESTONE AND

FIRESTONE SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL, SPECIAL, INCIDENTAL OR OTHER DAMAGES INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS OR DAMAGE TO THE BUILDING OR ITS CONTENTS OR THE ROOF DECK." *Id.*

[36] Pursuant to the Red Shield Warranty, Firestone's liability was limited to the repair of the leak and excluded consequential damages. James Montgomery testified that Dunford Roofing gave him an estimate of $9,500.00 to repair the roof. The trial court found that Maples proved damages in the amount of $9,500.00. The trial court's damage award was within the scope of the evidence, and I would affirm. Accordingly, I dissent from the majority's reversal and remand of the damage award.